UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

JASON ROBERT WYLIE,
and LEAH S. WYLIE,

                 Debtors.
_____/

TIMOTHY MILLER, TRUSTEE,

                 Plaintiff,

vs.

CHRISTOPHER SULLIVAN,

                 Defendant.
_____/

TIMOTHY MILLER, TRUSTEE,

                 Plaintiff,

vs.

KATHLEEN SULLIVAN,

                 Defendant.
_____/

Case No. 20-49216

Chapter 7

Judge Thomas J. Tucker

Adv. Pro. No. 21-4087

Adv. Pro. No. 21-4088

**POST-TRIAL OPINION**

## I.  Introduction

Each of these two adversary proceedings is a fraudulent transfer action under § 548 of the

Bankruptcy Code, 11 U.S.C. § 548.  In each case, the Chapter 7 bankruptcy Trustee seeks to

avoid a transfer of real estate located in Scott County, Arkansas.  The Chapter 7 bankruptcy

Debtors Jason Wylie and Leah Wylie made the transfers in 2018, one to Jason Wylie's mother

and the other to Jason Wylie's adoptive father, Defendants Kathleen Sullivan and Christopher Sullivan, respectively. The parties agree that the transfers were made within 2 years before the Debtors filed their bankruptcy petition. The parties further agree that the transfers were made for no consideration. And the transfers were made while the Debtors were insolvent.

As of 2014, the properties at issue had been owned for many years by the Defendants. The property owned by Kathleen Sullivan was approximately 250 acres of farmland in Scott County, Arkansas, containing no buildings (sometimes referred to as the "Kathleen Sullivan Property").[1] The property owned by Christopher Sullivan was approximately 117 acres of farmland in Scott County, Arkansas, containing the home of Christopher Sullivan, two "unusable dwellings," and two hay barns (sometimes referred to as the "Christopher Sullivan Property").[2] Since roughly the mid 1990's, Christopher Sullivan used both properties to farm "cattle, sheep, and goats."[3] Kathleen Sullivan has not lived in Arkansas since she and Christopher Sullivan were divorced in 1990, and since October 2010, she has lived in New Mexico.[4]

In 2014 and 2017, Defendant Kathleen Sullivan and Defendant Christopher Sullivan, respectively, had given and recorded deeds transferring their respective properties to themselves and their son, the Debtor Jason Wylie, as joint tenants with a right of survivorship. The

---

[1] *See* PX-12, Kathleen Sullivan Answers to Interrog. Nos. 3, 11. In this Opinion, the Court will cite the trial exhibits using this format: "PX-__" for the Trustee's exhibits; and "DX-__," for the Defendants' exhibits.

[2] *See* PX-13, Christopher Sullivan Answers to Interrog. Nos. 3, 11.

[3] Testimony of Jason Wylie (Tr. at 4). (*See* footnote 6 below regarding citations to the transcript of trial testimony.)

[4] *See id.* (Tr. at 61); Testimony of Kathleen Sullivan (Tr. at 138).

Defendants each allege that they made their transfer to Jason Wylie only for "estate planning purposes." The transfers made to Jason Wylie in 2014 and 2017, as well as the transfers back to the Defendants in 2018, all were made for no consideration.

The Trustee alleges that the 2018 transfers back to the Defendants were made "with actual intent to hinder, delay, or defraud" creditors of the Debtors, making the transfers avoidable under 11 U.S.C. § 548(a)(1)(A). The Trustee also alleges that the 2018 transfers are avoidable as constructively fraudulent, under 11 U.S.C. § 548(a)(1)(B), because the Debtors "received less than a reasonably equivalent value" in exchange for each of the transfers.[5] The Trustee seeks to recover the property transferred, under 11 U.S.C. § 550(a)(1).

The Defendants deny that they or the Debtors had any fraudulent intent. And they allege that before the Debtors made the 2018 transfers, the Debtors held only legal title to the property at issue, subject to an implied trust under Arkansas law in the Defendants' favor. As such, the Defendants contend, the property interests transferred by the Debtors had no value to either of the Debtors. Therefore, the Defendants say, the Debtors received "reasonably equivalent value" for

---

[5] These provisions in § 548(a) state, in pertinent part:

> (1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . , indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer . . .; and
>
> (ii)(I) was insolvent on the date that such transfer was made . . . , or became insolvent as a result of such transfer . . .[ .]

3

the 2018 transfers — *i.e.*, $0.00.

After extensive pretrial proceedings, some of which are described in this Opinion below, this Court held a joint bench trial in these two adversary proceedings. The Court now will decide these cases.

The Court has considered all of the evidence and arguments presented by the parties. This includes the testimony of all the witnesses — namely, the bankruptcy Debtors Jason Wylie and Leah Wylie; and the Defendants Kathleen Sullivan and Christopher Sullivan.[6] And the Court has considered the facts stipulated to by the parties,[7] and all the exhibits that were admitted into evidence.[8] This Opinion states the Court's findings of fact and conclusions of law.

For the reasons stated below, the Court finds in favor of each of the Defendants in these adversary proceedings, and will enter judgment accordingly.

## II. Jurisdiction

This Court has subject matter jurisdiction over the Chapter 7 bankruptcy case of the

---

[6] A transcript of the trial testimony of these witnesses is filed at Docket # 149 in Adv. No. 21-4087. Pages in the transcript are cited in this Opinion in the format: "Tr. at __."

[7] *See* Order Regarding Stipulated Facts and Admitted Exhibits for Purposes of Trial (Docket # 145 in Adv. No. 21-4087; Docket # 145 in Adv. No. 21-4088) (the "Stipulated Facts Order") at 2-4; Final Pretrial Order (Docket # 138 in Adv. No. 21-4087; Docket # 137 in Adv. No. 21-4088) at 20-21.

[8] The Trustee's exhibits admitted into evidence are PX exhibit nos. 2-3, 5 (to a limited extent and for a limited purpose), 6, 9, 11-15, 17, 19-20, 22-26, and 30. All of the Trustee's exhibits are filed at Docket # 142 in Adv. No. 21-4087 and at Docket # 142 in Adv. No. 21-4088.

The Defendants' only exhibit admitted into evidence is DX exhibit letter H ("All amended schedules and amended SOFA filed in the Wylie bankruptcy case"). All parts of the Defendants' Exhibit DX-H are on file in the main bankruptcy case, Case No. 20-49216, and copies of them are filed at Docket # 143 in Adv. No. 21-4087 (at pdf pp. 23-66) and at Docket # 143 in Adv. No. 21-4088 (at pdf pp. 23-66).

4

Wylies, and over each of these adversary proceedings, under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). As proceedings to avoid and recover fraudulent conveyances, these adversary proceedings are core proceedings under 28 U.S.C. § 157(b)(2)(H).

These adversary proceedings also are "core," with respect to all of the Trustee's claims (Counts I through III) in his First Amended Complaint in each case,[9] because they each fall within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11. *See* 28 U.S.C. § 1334(b). Matters within either of these categories are deemed to be core proceedings. *Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). These are proceedings "arising under title 11 because they are "created or determined by a statutory provision of title 11," *id.*, namely, the provisions of 11 U.S.C. §§ 548(a) and 550(a)(1). And each of these proceedings is one "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *Allard v. Coenen,* 419 B.R. at 27.

For these reasons, this Court has *statutory* authority, under 28 U.S.C. § 157(b)(1), to enter a final judgment on all of the counts (Counts I, II, and III) of the Trustee's First Amended Complaint in each of these cases. If and to the extent this Court might otherwise lack *constitutional* authority to enter a final judgment, under *Stern v. Marshall*, 564 U.S. 462 (2011),

---

[9] The Trustee's First Amended Complaint is filed at Docket # 13 in each adversary proceeding. In each case, the counts in the Trustee's First Amended Complaint (Docket # 13) are titled as follows: "Count I - Avoidance of Pre-petition Transfer - 11 U.S.C. §548(a)(1)(b);" "Count II - Avoidance of Pre-petition Transfer - 11 U.S.C. §548(a)(1)(a);" and "Count III - Liability of transferee and preservation of transfer - 11 U.S.C. §[§] 550 and 551."

5

such a problem does not exist in this case. This is because each of the parties has expressly,

knowingly, and voluntarily consented to this bankruptcy court entering a final order or judgment,

as permitted by 28 U.S.C. § 157(c)(2).[10] Given that consent, this bankruptcy court has both

statutory and constitutional authority to enter a final judgment on the Trustee's claims in Counts

I, II, and III of the First Amended Complaint in each of these adversary proceedings. *See Ralph*

*Roberts Realty, LLC v. Savoy* (*In re Ralph Roberts Realty*), 562 B.R. 144, 147-48 (Bankr. E.D.

Mich. 2016) (discussing, among other cases, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665

(2015)); *Dery v. Karafa* (*In re Dearborn Bancorp, Inc.*), 583 B.R. 395, 400 (Bankr. E.D. Mich.

2018).

## III. Procedural history: the Court's first summary judgment decision, and the Defendants' successful appeal to the district court[11]

In an opinion and order filed in each adversary proceeding on September 20, 2021, this

Court initially granted summary judgment for the Trustee, based on the Trustee's constructive

fraudulent transfer claim. *Miller v. Sullivan* (*In re Wylie*), 633 B.R. 542 (Bankr. E.D. Mich.

2021).[12] In making that decision, this Court viewed the Defendants' only asserted defense to the

constructive fraudulent transfer claim, and their only argument for an implied trust, to be that

before the Debtors made the transfers, the Debtors' interests in the properties at issue were

---

[10] *See* Report of Parties' Rule 26(f) Conference (Docket # 7 in Adv. No. 21-4087) at 3 ¶ 3(g); Report of Parties' Rule 26(f) Conference (Docket # 7 in Adv. No. 21-4088) at 3 ¶ 3(g).

[11] Much of what the Court states in Parts III and IV of this Opinion is taken from a previous opinion of this Court, regarding the cross-motions for summary judgment filed by the parties after the district court remand. *See Miller v. Sullivan* (*In re Wylie*), 654 B.R. 446, 449-51 (Bankr. E.D. Mich. 2023).

[12] *See* Docket ## 44, 45 in Adv. No. 21-4087; Docket ## 43, 44 in Adv. No. 21-4088.

subject to a resulting trust under Arkansas law, in Defendants' favor. Due to such resulting trusts, Defendants argued, the Debtors owned only bare legal title to each of the properties, while the Defendants owned all of the equitable interests.

Because the only Arkansas case law the Defendants cited dealt with purchase-money resulting trusts, this Court construed the Defendants' only argument to be that a purchase-money resulting trust existed. The Court rejected the Defendants' argument. The Court found that the requirements for such a resulting trust, as that concept is defined and limited under Arkansas law, were not met. As a result, the Court granted summary judgment for the Trustee, avoiding the transfers under 11 U.S.C. § 548(a)(1)(B), as constructively fraudulent. Based on that avoidance, the Court ruled that the bankruptcy estate owns a one-half interest in each of the Arkansas properties at issue. The Court found it unnecessary to rule on the Trustee's other fraudulent transfer theory, under 11 U.S.C. § 548(a)(1)(A), that the Debtors' transfers were made with actual intent to hinder, delay, or defraud creditors.

The Defendants appealed. The United States District Court reversed this Court's summary judgment decision, and remanded the cases for further proceedings. *See Sullivan v. Miller*, No. 21-cv-12349, 2022 WL 2703954, at *1, 6 (E.D. Mich. July 12, 2022).[13] The district court characterized the type of resulting trust discussed in this Court's summary judgment decision as a "purchase money resulting trust," and ruled that there are "different types of

---

[13] A copy of the district court's opinion and order appears at Docket # 70 in Adv. No. 21-4087 and at Docket # 68 in Adv. No. 21-4088.

resulting trusts" that are possible under Arkansas law. 2022 WL 2703954, at *4-5.[14] The district

court further ruled that the Defendants had sufficiently preserved for appeal an argument that a

different type of resulting trust had arisen in favor of the Defendants, which this Court had not

discussed.[15] Based on this, the district court remanded these cases "so that the bankruptcy court

may consider the broader argument." 2022 WL 2703954, at *5. The district court further ruled

that "[o]n remand, the bankruptcy court is free to explore any other pertinent issues bearing on

summary judgment, such as the Trustee's argument based on intent to hinder creditors and the

significance, if any, of [the Defendants'] agreement in February 2022 to a consent judgment for

the sale of the properties." *Id.* at *5 n.11.[16]

## IV. Proceedings after the district court's remand

After the district court's remand, in each of these adversary proceedings, the parties filed

---

[14] This aspect of the district court's ruling is discussed in detail in Part VII.A.3 of this Opinion, below.

[15] The district court stated that "this is a case where imprecise briefing led the bankruptcy court to read [the Defendants'] position too narrowly." *Sullivan v. Miller*, 2022 WL 2703954, at *4. The district court further stated:

> The lawyer who represented the Sullivans before the bankruptcy court was careless in his use of words and citation to inapposite caselaw. He advocated for the existence of "resulting trusts" without expressly specifying that he did not mean purchase-money resulting trusts. And in support of his arguments, he cited Arkansas cases involving purchase money resulting trusts. It is, therefore, understandable that the bankruptcy court believed the Sullivans to be raising solely an argument of purchase-money resulting trusts.

*Id.* at *5.

[16] The February 2022 consent judgment is discussed in Part VI.A.1 of this Opinion, below.

renewed motions for summary judgment,[17] each seeking summary judgment on all three counts of the Trustee's First Amended Complaint. After extensive briefing by the parties and a hearing, the Court denied each of the summary judgment motions. *See Miller v. Sullivan* (*In re Wylie*), 654 B.R. 446 (Bankr. E.D. Mich. 2023).[18] The Court then held the joint bench trial.

## V. Basic facts

Many of the basic facts in these cases are undisputed, and many of those facts were stated in Part V of this Court's first summary judgment opinion, *Miller v. Sullivan*, 633 B.R. at 547-49. The Court restated many of these same facts in Part VI of its second summary judgment opinion, filed after the district court remand, and the Court stated that such facts "remain undisputed." *See Miller v. Sullivan*, 654 B.R. at 451-53. The following basic facts are undisputed, and/or were established by undisputed evidence presented at trial.[19] Other facts, and certain evidence presented at trial, are discussed in Parts VII.A.4 and VII.B of this Opinion, below.

### A. The Defendants (the Sullivans)

Defendant Christopher Sullivan is the Debtor Jason Wylie's adoptive father,[20] and Defendant Kathleen Sullivan is Jason Wylie's mother. Neither of the Defendants has any

---

[17] Docket ## 72, 76 in Adv. No. 21-4087; Docket ## 70, 74 in Adv. No. 21-4088.

[18] *See also* Docket ## 128, 129 in Adv. No. 21-4087; Docket ## 122, 123 in Adv. No. 21-4088.

[19] In restating these facts now, this Opinion will cite some of the record evidence that it cited in its second summary judgment opinion, as well as evidence from the trial.

[20] Jason Wylie's biological father is deceased. Defendant Christopher Sullivan is Jason Wylie's adoptive father, although Jason sometimes also calls Christopher his stepfather. (*See* Testimony of Jason Wylie (Tr. at 67-68)).

children other than Jason Wylie.[21]  The Defendants were married in 1983, and then later were

divorced, in 2009.[22]  After that, Kathleen Sullivan has remained unmarried, while Christopher

Sullivan was remarried in 2013, to Daisy (Gonzalez) Sullivan.[23]

## B.  The Sullivans purchased the real property at issue in 1990 and 1991, and Christopher Sullivan conveyed some of the property to Kathleen Sullivan in 2009, after their divorce.

The real estate involved in this case is located in Scott County, Arkansas.  The following

recitation of the early history of this real estate, which was stated in the Trustee's very first

summary judgment brief, is accurate, based on the evidence in the record, and undisputed:

> Christopher and Kathleen Sullivan purchased approximately
> 268.75 acres of property in Scott County Arkansas in 1990 ("1990
> Property").  Christopher and Kathleen Sullivan purchased
> approximately 81 acres of property in Scott County Arkansas in
> 1991 ("1991 Property") . . . . On December 31, 2009 (after
> Christopher and Kathleen Sullivan's divorce), through a series of
> four quit claim deeds, the parties transferred the 1991 Property and
> approximately 140 acres of the 1990 Property to Kathleen Sullivan.
> Christopher Sullivan retained approximately 117.50 acres of the
> 1990 Property.[24]

## C.  The Sullivans conveyed to Jason Wylie a one-half interest in their respective properties, in 2014 (Kathleen) and in 2017 (Christopher).

The Trustee's recitation continued by describing transfers made by the Defendants to

---

[21]  *Id.* (Tr. at 3); Testimony of Christopher Sullivan (Tr. at 70-71).

[22]  Testimony of Christopher Sullivan (Tr. at 71).

[23]  *Id.*

[24]  Trustee's Br. in Supp. of Trustee's Mot. for Summ. J. (Docket # 24 in Adv. No. 21-4087, the "Trustee's Br. in 21-4087") at pdf p. 7 (record citations omitted); *see also* Trustee's Br. in Supp. of Trustee's Mot. for Summ. J. (Docket # 25 in Adv. No. 21-4088, the "Trustee's Br. in 21-4088") at pdf p. 7 (record citations omitted).

10

Jason Wylie, in 2014 by Kathleen Sullivan and in 2017 by Christopher Sullivan. As for

Kathleen:

> On March 24, 2014, Kathleen Sullivan transferred a ½ interest in
> the 1991 Property and her portion of the 1990 Property to her son
> Jason Wylie via quit claim deed for stated consideration of $0.00
> almost 23 years after the Properties were acquired.[25]

Kathleen Sullivan's 2014 deed, entitled "Warranty Deed," which was recorded on March 24,

2014, conveyed her property to herself and Jason Wylie, "**as joint tenants with full rights of**

**survivorship, and not as tenants in common**."[26]

As for Christopher:

> On July 12, 2017, Christopher Sullivan transferred [a ½ interest in]
> his portion of the 1990 Property to his stepson Jason Wylie . . . for
> stated consideration of $0.00 almost 26 years after the Properties
> were acquired.[27]

Christopher Sullivan's 2017 deed, entitled "Warranty Deed," which was recorded on July 12,

2017, conveyed his property to himself and Jason Wylie, "**as joint tenants with rights of**

**survivorship, and not as tenants in common**."[28]

**D. The Debtors Jason Wylie and his wife, Leah Wylie, conveyed their interests in
the Arkansas properties back to Kathleen Sullivan and Christoper Sullivan in
2018, for no consideration and while the Debtors were insolvent.**

By two Warranty Deeds, each dated August 23, 2018, signed on October 1, 2018, and

---

[25] Trustee's Br. in 21-4088 (Docket # 25) at pdf pp. 7-8 (footnotes and record citations omitted).

[26] Docket # 25-1 in Adv. No. 21-4088, Ex. I; *see also* PX-2 (bold in original).

[27] Trustee's Br. in 21-4087 (Docket # 24) at pdf pp. 7-8 (footnotes and record citations omitted).

[28] Docket # 24-1 in Adv. No. 21-4087, Ex. I; *see also* PX-3 (bold in original).

recorded on October 12, 2018, the Debtors Jason Wylie and Leah Wylie transferred their interests in the Arkansas properties back to Kathleen Sullivan and Christopher Sullivan (the "2018 Transfers").[29]  The property described in the Debtors' deed to Kathleen Sullivan consisted of three tracts of land, containing a total of approximately 250.88 acres,[30] and the property described in the Debtors' deed to Christopher Sullivan consisted of land in the amount of approximately 117.50 acres.[31]

The parties agree, and the Court has ruled, that the 2018 Transfers were made within 2 years before the date on which the Debtors filed their bankruptcy petition.[32]  The Debtors were both insolvent when they made these transfers, and the Court has so ruled.[33]  And the parties agree that the Debtors received no consideration for these transfers.

### E.  The implied trust defense

The Trustee has alleged that in the 2018 Transfers, the value of the one-half interest in the

---

[29]  PX-14; *see also* Docket # 25-1 in Adv. No. 21-4088, Ex. A (Warranty Deed to Kathleen Sullivan); PX-13; *see also* Docket # 24-1 in Adv. No. 21-4087, Ex. A (Warranty Deed to Christopher Sullivan).

[30]  PX-14.

[31]  PX-13.

[32]  *See Miller v. Sullivan* (*In re Wylie*), 654 B.R. 446, 462 (Bankr. E.D. Mich. 2023 (footnote omitted).  The Debtors filed their joint bankruptcy petition on August 27, 2020.  Under 11 U.S.C. § 548(d)(1), the transfers at issue are deemed to have been made when they were perfected, *i.e.*, when the deeds were recorded, on October 12, 2018.

[33]  In its second, post-remand summary judgment ruling, this Court ruled that there is no genuine issue of material fact about this insolvency, and that it is "deemed established . . . for purposes of trial." *Miller v. Sullivan*, 654 B.R. at 462.  And in both of its summary judgment opinions, the Court found that the parties "agree that the Debtors were insolvent when they made" the 2018 Transfers.  *See Miller v. Sullivan*, 654 B.R. at 453; *Miller v. Sullivan*, 633 B.R. at 548.  Specifically, it is established that on October 12, 2018, the date when the 2018 Transfers were made, the Defendants were both insolvent, within the meaning of 11 U.S.C. §§ 101(32)(A) and 548(a)(1)(B)(ii)(I).

12

real estate the Debtors transferred to Kathleen Sullivan was "not less than $439,040.00," and that the value of the one-half interest in the real estate the Debtors transferred to Christopher Sullivan was "not less than $411,250.00."[34] But in the briefing and arguments about the pre-remand summary judgment motions, as well as those about the post-remand summary judgment motions, the Trustee presented no evidence to support his allegations about the value of the property interests transferred by the Debtors in the 2018 Transfers. Nor did the Trustee do so at trial, as discussed in Part VII.B.1 of this Opinion, below.

In litigating the two rounds of summary judgment motions, and at trial, the Defendants did not dispute or admit the Trustee's assertions about the value of the land at issue. But the Defendants contend that the value of the interest transferred by the Debtors, by each of the two 2018 deeds, was $0.00, because the Debtor Jason Wylie held only legal title to these one-half interests, and the equitable interests were owned entirely by Kathleen Sullivan and Christopher Sullivan, each as the beneficiary of an implied trust under Arkansas law.

## VI. The Court reiterates its decision and rulings made in its second summary judgment opinion.

Now that the trial has been completed and the Court will be entering a final judgment in each of these cases, the Court reiterates the decision and rulings that it made in its second summary judgment opinion. *See Miller v. Sullivan* (*In re Wylie*), 654 B.R. 446 (Bankr. E.D. Mich. 2023). The Court will describe its second summary judgment decision in some detail.

### A. This Court's second, post-remand summary judgment decision

---

[34] *See* Final Pretrial Order (Docket # 138 in Case No. 21-4087) at pdf p. 5; Final Pretrial Order (Docket # 137 in Case No. 21-4088) at pdf p. 5.

### 1. The Trustee's § 363(h) lawsuit, and the effect of the consent judgment in that case

While the Defendants' district court appeal was still pending, the Trustee and the Defendants entered into a consent judgment in a separate but related adversary proceeding, on February 25, 2022. In briefing and arguing the post-remand summary judgment motions in these cases, the parties disputed the effect of that consent judgment on the Trustee's avoidance claims in these cases.

That related adversary proceeding was filed by the Trustee in this Court on October 12, 2021, against both of the Defendants, Adv. No. 21-4234 (the "363(h) Lawsuit"). The Trustee filed that suit shortly after the Trustee obtained the September 20, 2021 summary judgments, avoiding the 2018 Transfers and determining that the Wylie bankruptcy estate owned a one-half interest in each of the Arkansas properties. In the complaint in the 363(h) Lawsuit, the Trustee sought, among other things, an order under 11 U.S.C. § 363(h) authorizing the Trustee to sell, for the benefit of the Debtors' bankruptcy estate, the Arkansas properties, free and clear of the respective interests of the co-owners — *i.e.*, the Defendants, and then to distribute one-half of the net proceeds of the sale to the bankruptcy estate and the other half to the Defendants, based on their interests in their respective properties.[35]

On February 25, 2022, while the Defendants' appeal to the district court was still pending, and before this Court had made any substantive rulings in the 363(h) Lawsuit, the

---

[35] *See* Docket # 1 in Adv. No. 21-4234. Section 363(h) states requirements that must be met before the Trustee could sell the estate's interest *and* the interests of the co-owners. And Bankruptcy Code sections 363(i) and 363(j) contain certain rules that apply to such a § 363(h) sale. *See* 11 U.S.C. §§ 363(h), 363(i), 363(j).

14

Trustee and each of the Defendants entered into and filed a stipulation for the entry of a consent judgment, to resolve the 363(h) Lawsuit.[36]  Later that same day, the Court entered the consent judgment, entitled "Consent Final Judgment" (the "Consent Judgment"), based on the stipulation of the parties.[37]

Neither the Consent Judgment nor the parties' stipulation to that Consent Judgment said anything about the Defendants' pending appeal.  That is somewhat puzzling, because at first blush, the Consent Judgment appeared to be inconsistent with the Defendants' continuation of their appeal.  The Consent Judgment authorized the Trustee "to sell free and clear of the interests of the co-owner, Christopher Sullivan, [the Christopher Sullivan Property]," under 11 U.S.C. § 363(h), and "to sell free and clear of the interests of the co-owner, Kathleen Sullivan, [the Kathleen Sullivan Property]," under 11 U.S.C. § 363(h).[38]  And the Consent Judgment provided that the Wylie bankruptcy estate would receive one half of the net proceeds of the sale of the properties.[39]

At first blush, all of that seems inconsistent with the possibility that the district court might reverse this Court's summary judgment decision in these two adversary proceedings, because such a reversal would remove the Wylie bankruptcy estate's ownership interest in the Arkansas properties, and thereby would remove the bankruptcy estate's right to sell the properties and receive any of the proceeds of such a sale.

---

[36]   *See* Docket # 31 in Adv. No. 21-4234.

[37]   *See* Docket # 32 in Adv. No. 21-4234.

[38]   *Id.* at ¶¶ 1-2.

[39]   *See id.* at ¶¶ 4-5.

15

After the district court's remand, the parties made several arguments in their renewed summary judgment motions. One of the Trustee's arguments was based on the Consent Judgment entered in the 363(h) Lawsuit. The Trustee argued that the Consent Judgment precluded the Defendants from disputing that the Trustee is entitled to avoid the 2018 Transfers.[40] The Defendants disputed the Trustee's argument.[41]

After the parties briefed this issue extensively and the Court heard oral argument, the Court rejected the Trustee's argument, and held that the Consent Judgment does *not* preclude the Defendants from continuing to dispute that the 2018 Transfers are avoidable. The Court's reasoning and ruling about the Consent Judgment is factually and legally complex, and is explained at length in the Court's second summary judgment opinion. The Court will not repeat that discussion here, but rather incorporates it by reference, and now reiterates everything that it ruled regarding the Consent Judgment. *See Miller v. Sullivan*, 654 B.R. at 453-61.

**2. The Court's ruling on other post-remand summary judgment issues**

In its decision on the post-remand summary judgment motions, the Court concluded that genuine issues of material fact precluded granting summary judgment in favor of the Trustee or in favor of either of the Defendants, on any count in the Trustee's complaints. The Court further stated:

---

[40] *See, e.g.*, Trustee's Resp. to Def.'s Mot. for Summ. J. (Docket # 75 in Adv. No. 21-4087) at pdf pp. 22-24; Br. in Supp. of Trustee's Mot. for Summ. J. (Docket # 76 in Adv. No. 21-4087) at pdf pp. 20-22.

[41] *See, e.g.*, Defs.' Br. in Opp'n to Trustee's Mot. for Summ. J. (Docket # 77 in Adv. No. 21-4087) at pdf pp. 7-11, 21-26. As noted in Part III of this Opinion, one of the issues the district court left to this Court to decide on remand was "the significance, if any, of the [the Defendants'] agreement in February 2022 to a consent judgment for the sale of the properties." The district court expressed no view or opinion about that issue.

16

Such genuine issues include the following:

A. As to Count II of the Complaint,[42] whether the Debtors Jason Wylie and Leah Wylie made the 2018 Transfers "with actual intent to hinder, delay, or defraud" any creditor, within the meaning of 11 U.S.C. § 548(a)(1)(A).

B. As to Count I of the complaint, whether the Debtors Jason Wylie and Leah Wylie "received less than a reasonably equivalent value in exchange for" the 2018 Transfers, within the meaning of 11 U.S.C. § 548(a)(1)(B)(i). This issue includes the following sub-issues:

i. Whether, just before making the 2018 Transfers, the Debtor Jason Wylie and/or the Debtor Leah Wylie held only legal title to a one half interest in the Arkansas properties at issue, subject to an implied trust, such as a resulting trust of the type(s) described in the district court's July 12, 2022 opinion, under Arkansas law, in each Defendant's favor.

ii. Alternatively, whether, just before making the 2018 Transfers, the Debtor Jason Wylie and/or the Debtor Leah Wylie owned legal and equitable title to an undivided one half interest in each of the Arkansas properties at issue, with a right of survivorship, not subject to any implied or resulting trust under Arkansas law.

There is a conflict in the evidence about these issues that precludes summary judgment. For example, evidence that tends to support the Defendants' position includes the Declarations under Penalty of Perjury by the Defendants and by the Debtors, Jason Wylie and Leah Wylie. But the Trustee challenges the credibility and truthfulness of those Declarations, with evidence including circumstantial evidence, and the Court is not required to believe

_____

[42] **[Footnote in the Court's summary judgment opinion]**: Here the word "Complaint" refers to (1) the Trustee's First Amended Complaint filed in Adv. No. 21-4087 (Docket # 13); and (2) the Trustee's First Amended Complaint filed in Adv. No. 21-4088 (Docket # 13).

17

the Declarations, particularly at this summary judgment stage of the cases. And there is evidence, including circumstantial evidence, and other grounds, that tend to support the Trustee's position. This includes (1) the wording of the 2014 and 2017 warranty deeds by which the Defendants transferred interests in the Arkansas properties to Jason Wylie; (2) the fact that those deeds were drafted by an Arkansas attorney for the Defendants, and that under Arkansas law the Defendants could have used a "beneficiary deed,"[43] but did not do so; (3) the rebuttable presumption under Arkansas law that the 2014 and 2017 deeds were intended simply as gifts from one family member to another, rather than a transfer of mere legal title only;[44] and (4) the timing of the 2018 Transfers and the Debtors' insolvency and other financial circumstances at that time.[45]

The Court identified certain issues which were *not* genuinely disputed, as follows:

> There is no genuine issue of material fact regarding the following elements of the Plaintiff Trustee's avoidance claims, and these elements are deemed established in each adversary proceeding, including for purposes of trial:
>
> A. Each of the 2018 Transfers was a "transfer of an interest of the debtor [*i.e.*, the Debtor Jason Wylie and also possibly

---

[43] **[Footnote in the Court's summary judgment opinion]**: Under Arkansas law, it was and is possible, and would have been effective, to give a "beneficiary deed," which "is a deed without current tangible consideration that conveys upon the death of the owner an ownership interest in real property . . . to a grantee designated by the owner and that expressly states that the deed is not to take effect until the death of the owner." Ark. Code Ann. § 18-12-608(a)(1)(A). The 2014 and 2017 warranty deeds did not include this language, and therefore were not beneficiary deeds.

[44] **[Footnote in the Court's summary judgment opinion]**: *See, e.g.*, *United States Trustee v. Beard* (*In re Beard*), 595 B.R. 274, 288 (Bankr. E.D. Ark. 2018); *see also Walker v. Hooker*, 667 S.W.3d 637, 642 (Ark. 1984) (discussing such rebuttable presumption in the situation where a purchase money resulting trust otherwise might arise); Restatement (Second) of Trusts § 405, Comment (a) (Am. L. Inst. 1959) (updated 2023) (stating the general rule that "[w]here a transfer of property is made without consideration, the inference is that the transferor intends to make a gift to the transferee, not that he intends that the transferee should hold the property for the benefit of the transferor. This is true even though it appears in the instrument of conveyance that no consideration is paid for the conveyance.").

[45] **[Footnote in the Court's summary judgment opinion]**: *Miller v. Sullivan*, 654 B.R. at 461-62.

18

the Debtor Leah Wylie] in property" within the meaning of 11 U.S.C. § 548(a)(1).

B. Each of the 2018 Transfers "was made . . . on or within 2 years before the date of the filing of the petition [*i.e.*, the bankruptcy petition filed by the Debtors Jason Wylie and Leah Wylie]" within the meaning of 11 U.S.C. § 548(a)(1).

C. Each of the 2018 Transfers was made for no consideration.

D. The Debtors Jason Wylie and Leah Wylie both were "insolvent on the date that [the 2018 Transfers were] made" within the meaning of 11 U.S.C. § 548(a)(1)(B)(ii)(I).[46]

The Court now reiterates all of the foregoing summary judgment conclusions.

## VII. Discussion

### A. The nature and extent of the Debtors' interests in the Arkansas properties just before they made the 2018 Transfers

### 1. Arkansas law applies

The Court must determine what the nature and extent of the Debtors' interests were in the Arkansas properties just before the Debtors made the 2018 Transfers to the Defendants. The parties take no particular position about whether the Debtor Leah Wylie had any interest in the properties, but they agree that to the extent the Debtor Leah Wylie had an interest in the properties, it was purely based on her status as the spouse of the Debtor Jason Wylie, since Jason was a grantee under the 2014 and 2017 deeds from the Defendants while Leah was not a grantee. Leah Wylie's interest, if any, therefore was derivative of whatever interest Jason Wylie had in the Arkansas properties. So the Court will focus on the nature and extent of the interest that Jason

---

[46] *Miller v. Sullivan*, 654 B.R. at 462 (footnotes omitted).

Wylie obtained in the Arkansas properties.

The parties correctly agree that the law of Arkansas, where the real property at issue is located, applies to this determination. *See, e.g., United States Trustee v. Beard (In re Beard)*, 595 B.R. 274, 288 (Bankr. E.D. Ark. 2018) (applying Arkansas law because the property at issue was located in Arkansas); *Cowden v. Ramsay (In re Ramsay)*, 154 B.R. 531, 533 (Bankr. E.D. Ark. 1993) (citations omitted) ("While federal bankruptcy law determines the effect of legal or equitable interests in property, the Court looks to state law to determine the nature and extent of the interest."). In its opinion on the Defendants' appeal, the district court agreed that Arkansas law applies. *See Sullivan v. Miller*, 2022 WL 2703954, at *2 n.7.

**2. On their face, the 2014 and 2017 deeds each conveyed to Jason Wylie an undivided joint interest with the grantors, both legal and equitable, in the Arkansas properties, with and subject to a right of survivorship.**

The language of both the 2014 deed from Katherine Sullivan to Jason Wylie, and the 2017 deed from Christopher Sullivan to Jason Wylie, is unambiguous. If the Court considered only the face of those deeds, the Court would have to conclude that each deed gave Jason Wylie an undivided interest, both legal and equitable, in the Arkansas property, as a joint tenant with the grantor, with and subject to the right of survivorship. By statute, Arkansas law recognizes the validity of such a joint tenancy with right of survivorship. In both 2014 and 2017, section 18-12-106 of the Arkansas Statutes Annotated stated, as it does today, the following, in relevant part:

> (a) Interests in real property may be conveyed to two (2) or more persons, regardless of their relationship to each other, as joint tenants with right of survivorship.
>
> (b) Any person who owns an interest in real property may convey that interest or any portion thereof to himself or herself and one (1) or more other persons, regardless of their relationship to each

other, as joint tenants with right of survivorship.

Ark. Code Ann. § 18-12-106. Under Arkansas law, when two persons own property in a joint tenancy with a right of survivorship, each joint tenant is considered an owner of the whole of the property, and when one dies, the other automatically becomes the sole owner of the whole. This rule applies to ownership of both personal property and real property. The Supreme Court of Arkansas explained the concepts in this way:

> [I]n *Miller v. Riegler*, 243 Ark. 251, 419 S.W.2d 599 (1967), we considered with approval the Arizona Supreme Court's discussion of the history of joint tenancy and that part of the discussion relevant here reads as follows:
>
>> Another characteristic of joint tenancy is that it is not testamentary but "is a present estate in which both joint tenants are seized in the case of real estate, and possession in case of personal property, per my et per tout," that is, such joint tenant is seized by the half as well as by the whole. The right of survivorship in a joint tenancy therefore does not pass anything from the deceased to the surviving joint tenant. **Inasmuch as both cotenants in a joint tenancy are possessors and owners per tout, *i.e.*, of the whole, the title of the first joint tenant who dies merely terminates and the survivor continues to possess and own the whole of the estate as before.**
>
> Consistent with the foregoing, the rule appears well settled that a devise by a joint tenant, who is survived by other joint tenants, is not effective to pass any title to the real estate in joint tenancy for the reason that the title passes by operation of law to the survivor or survivors. Such a rule applies in full measure to personal property. In sum, title to property held in joint tenancy takes precedence over the claim of a devisee, legatee or heir, as the case may be.

*Gladson v. Gladson*, 800 S.W.2d 709, 710 (Ark. 1990) (citations omitted) (emphasis added).

If there was no evidence other than the language of the 2014 and 2017 deeds, therefore, the Court would have to conclude that Jason Wylie obtained ownership, both legal and equitable, of the whole of each of the Arkansas properties, jointly with the grantors, Kathleen Sullivan and Christopher Sullivan, which ownership was subject to the right of survivorship.

But the Defendants have presented other evidence, in addition to the deeds, which they contend shows that Jason obtained only bare legal title to the Arkansas properties. According to the Defendants, the equitable interest in the Arkansas properties remained entirely with each of them, based on an implied trust.

### 3. Arkansas law on implied trusts

Arkansas law recognizes certain forms of implied trust, under which a grantee's interest in real property, under a deed that expressly conveys the property to the grantee, can be subject to an implied trust. Such an implied trust gives to the grantor, or some other person(s) not named as a grantee in the deed, an equitable interest in the property. Such a person is considered the beneficiary of an implied trust, and the grantee's ownership of the property is subject to and limited by the implied trust.

The parties agree that Arkansas law recognizes that such an implied trust can exist under certain circumstances, but they disagree about when such an implied trust can be found to exist. To begin with, the parties agree that Arkansas law recognizes what the district court called a "purchase-money resulting trust," and that Arkansas law also recognizes what the parties call a "constructive trust." But as discussed below, the parties also agree that neither of these types of implied trust existed in this case. The Trustee contends that no other type of implied trust can exist under Arkansas law, while the Defendants contend otherwise.

a.  **There was no "purchase-money resulting trust."**

In its first summary judgment opinion, this Court discussed the purchase-money resulting trust under Arkansas law, but referred to it only as a "resulting trust."  The Court found that such a trust did not exist in this case.  This Court explained what the requirements are for a purchase-money resulting trust under Arkansas law, and why those requirements were not met in this case, as follows:

> Under Arkansas law, "[t]he party asserting a resulting trust has a heavy burden of proof[.]"  *Walker v. Hooker*, 667 S.W.2d 637, 642 (Ark. 1984).  The following is an accurate statement of the law of Arkansas, regarding what a resulting trust is and what requirements must be met in order to show the existence of a resulting trust:

>> [A] resulting trust is said to arise when property is bought by one person with money or assets of another and title is taken in the name of the purchaser rather than of the person furnishing the consideration. **In order to constitute a resulting trust the purchase money or a specified part of it must have been paid by another or secured by another at the same time, or previous to the purchase, and must be a part of the transaction. In other words, the trust results from the original transaction at the time it takes place and at no other time, and is founded upon the actual payment of money and upon no other ground.**

> *Andres v. Andres*, 1 Ark. App. 75, 613 S.W.2d 404, 406, 407 (1981) (emphasis added) (citations omitted).

> In addition to the *Andres* case just quoted, at least seven Arkansas Supreme Court cases have held that all of the above requirements must be met in order to establish the existence of a resulting trust.  *See Walker*, 667 S.W.2d at 642; *Wargo v. Wargo*, 226 Ark. 36, 287 S.W.2d 879, 882 (1956); *Reeves v. Reeves*, 165 Ark. 505, 264 S.W. 979, 980 (1924); *Pumphrey v. Furlow,* 144 Ark. 219, 222 S.W. 31, 33 (1920); *Milner v. Freeman*, 40 Ark. 62,

23

67, 68 (1882); *DuVal v. Marshall*, 30 Ark. 230, 245 (1875); *Sale v. McLean*, 29 Ark. 612, 630 (1874).

As applied to real estate, therefore, these cases establish the following five requirements to demonstrate the existence of a resulting trust:

> 1. a purchase of real estate;
>
> 2. a payment of all or part of the purchase price by the alleged trust beneficiary;
>
> 3. which payment was made at or before the time of the purchase of the real estate;
>
> 4. which payment was made as part of the original real estate purchase transaction; and
>
> 5. as part of the original real estate purchase transaction, the taking of title in the name of the alleged trustee, rather than in the name of the alleged trust beneficiary.

*Miller v. Sullivan*, 633 B.R. at 550. The Court ruled that requirement nos. 3-5 above could not be met, because

> [a]t the time when the Defendants each conveyed an interest in their real estate to the Debtor Jason Wylie, in 2014 in the case of Kathleen Sullivan, and in 2017 in the case of Christopher Sullivan, the Defendants had owned all of the real estate for 23 years or more. The Defendants jointly purchased the real estate in 1990 and 1991, and Christopher had deeded some of the jointly-owned real estate to Kathleen in 2009, after their divorce.

*Id.* at 551.

Thus, the Court ruled, there was no purchase-money resulting trust. *Id.* at 552. The Court reiterates that ruling now. The district court did not disturb this ruling on appeal, and after the district court's remand, the Defendants have not claimed that there was any purchase-money

24

resulting trust. Rather, the Defendants' counsel conceded that there was no purchase-money resulting trust, during his closing argument at trial.

**b. There was no "constructive trust."**

Under Arkansas law, a constructive trust is defined in this way:

> Constructive trusts are said to arise and be imposed in favor of persons entitled to a beneficial interest against one who secures legal title either by an intentional false oral promise to hold title for a specified purpose, and having thus obtained title, claims the property as his own, or who violates a confidential or fiduciary duty or is guilty of any other unconscionable conduct which amounts to constructive fraud.

*Andres v. Andres*, 613 S.W.2d 404, 407 (Ark. Ct. App. 1981) (citations omitted). In its first summary judgment opinion, this Court also described Arkansas law on constructive trusts, and ruled that there was no basis to find that there was a constructive trust:

> [T]he Defendants do not argue that there was a constructive trust under Arkansas law with respect to the real property. As a result, Defendants have forfeited any such argument. And such an argument would be without merit. Under Arkansas law, constructive trusts "are imposed against a person who secures legal title by violating a confidential relationship or fiduciary duty or who intentionally makes a false oral promise to hold legal title for a specific purpose and, after having acquired the title, claims the property for himself." *Herring v. Ramsey*, 2021 Ark. App. 249, 626 S.W.3d 116, 119-20 (2021) (citation omitted). Defendants do not allege that Jason Wylie or Leah Wylie engaged in any such conduct.

*Miller v. Sullivan*, 633 B.R. at 552 n.13. The Court reiterates the above rulings now. The district court did not disturb these rulings about constructive trusts on appeal, and after the district court's remand, the Defendants have not claimed that there was any constructive trust.

**c. The Defendants are correct in arguing that Arkansas law recognizes what the Defendants call a "retained-interest implied trust**."

25

The Defendants argue that Arkansas law recognizes a broader universe of implied trusts than just the purchase-money resulting trust and the constructive trust. They argue that an implied trust can exist in favor of the grantor of a deed when that grantor did not intend to convey any beneficial or equitable interest in the property to the grantee, but rather the grantee intended to retain such interest. The Defendants have given this type of implied trust a name that they admit is not found in any Arkansas case: the "retained-interest implied trust." But, Defendants argue, Arkansas cases have recognized such an implied trust in substance, if not in name. The Court will use the name picked by the Defendants for short-hand reference.

The Trustee disagrees with Defendants' argument that such an implied trust is recognized under Arkansas law. Instead, the Trustee argues, the only types of implied trusts that Arkansas law recognizes are the purchase-money resulting trust and the constructive trust, as those are described above.

The Trustee has cited no case applying Arkansas law that says this. The Court must reject the Trustee's argument. While the terminology used in the Arkansas cases is not always clear and consistent, the Arkansas case law does support the Defendants' argument, and recognizes that there can be a retained-interest implied trust.

First, the district court's opinion in the appeal in this case discusses Arkansas law, and cites Arkansas cases, in a way that undermines the Trustee's legal argument. And after the district court's decision and remand to this Court, of course, this Court is bound to follow the district court's decision. The district court discussed the Defendants' implied trust argument and the Arkansas cases, in pertinent part, as follows:

> The Sullivans assert[] . . . that the Wylies held only legal title

26

because Kathleen's and Christopher's sole purpose in transferring a one-half interest in their respective properties to Jason was "estate planning."  The Sullivans argued that they were the beneficiaries of "resulting trusts" because they intended to retain control of their properties even though the warranty deeds made Jason a joint tenant with a right of survivorship.  (citing First National Bank v. Rush, 785 S.W.2d 474, 478 (Ark. App. 1990)).

"There are different types of resulting trusts."  Edwards v. Edwards, 843 S.W.2d 846, 849 (Ark. 1992). . . .
. . . .

[T]he Sullivans asserted that "[t]his is an appropriate case for the imposition of an implied resulting trust," once again without specifying the label of the applicable resulting trust.   However, the Sullivans explained that "[t]he real question here is whether or not, prior to the second deed, Jason owned an interest in the Arkansas land that his creditors could have benefited from."  Further, they articulated that "[t]he answer is no" because, after Jason was added to the title for the Kathleen [Sullivan] Property and the title for the Christopher [Sullivan] Property, he "had absolutely no say in the use of the property, and received nothing from the use of the propert[ies]"; Jason "was to have no substantive interest in the propert[ies] whatsoever until [Kathleen's and Christopher's] death[s]."
. . . .

While Arkansas courts have acknowledged that there are "different types of resulting trusts," Edwards, 843 S.W.2d at 859, Arkansas cases often use the term "resulting trust" to refer to purchase-money resulting trusts, see, e.g., Andres [v. Andres, 613 S.W.2d 404, 406 (Ark. 1981)] ("In general a resulting trust is said to arise when property is bought by one person with money or assets of another and title is taken in the name of the purchaser rather than of the person furnishing the consideration.").  However, there is no Arkansas authority holding that a resulting trust refers only to purchase-money resulting trusts.  **In fact, the language from Edwards, noting that there are "different types of resulting trusts," and its endorsement of the broad definition of the term given in a scholarly treatise**, suggest the contrary:

> **[A] resulting trust arises in favor of the person**
> **who transferred the property or caused it to be**

**transferred under circumstances raising an
inference that he intended to transfer to the
other a bare legal title and not to give him the
beneficial interest.**

> Edwards, 843 S.W.2d at 849 (1992) (quoting Scott on Trusts,
> § 404.2 (1989)).[47]  That would be consistent with the law in other
> jurisdictions, holding that "resulting trust" is not confined to
> purchase-money resulting trusts. See e.g., Stewart v. Shubert (In re
> Stewart), 368 B.R. 445, 451 (Bankr. E.D. Pa. 2007).

*Sullivan v. Miller*, 2022 WL 2703954, at *2-3, 4-5 (record citations omitted) (emphasis added).

In addition to the opinion of the district court, quoted above, this Court's review of

Arkansas cases persuades the Court that the Defendants' legal theory has merit — namely, that

Arkansas law does recognize, in substance, the type of retained-interest implied trust asserted by

the Defendants.  The question then becomes whether and to what extent the evidence in this case

supports the application of Defendants' legal theory.

The Court will review the key cases that persuade it that Arkansas law recognizes that a

retained-interest implied trust can exist.

---

[47]  At this point in its opinion, the district court included the following as a footnote:

> This definition of a resulting trust is nearly identical to the one offered
> by the Restatement (Third) of Trusts, § 7 (2003):

>> A resulting trust arises when a person (the "transferor")
>> makes or causes to be made a disposition of property
>> under circumstances (i) in which some or all of the
>> transferor's beneficial interest is not effectively
>> transferred to others (and yet not expressly retained by
>> the transferor) and (ii) which raise an unrebutted
>> presumption that the transferor does not intend the one
>> who receives the property (the "transferee") to have the
>> remaining beneficial interest.

*Id.* at *5 n.10.

28

The first such case is *Edwards v. Edwards*, 843 S.W. 2d 846 (Ark. 1992), the Arkansas Supreme Court case relied on by the district court in its appeal opinion, quoted above. *Edwards* is not directly on point, because that case involved only a purchase-money resulting trust. *See Edwards*, 843 S.W.2d at 849 ("There are different types of resulting trusts but that which concerns us here is often called a purchase money resulting trust . . . ."). But *Edwards* contains language tending to support the Defendants' legal theory.

The *Edwards* case involved a dispute between two siblings, Joe Edwards and Nancy Edwards, over ownership of a home that had been purchased by their late mother, Edna Edwards. When she bought the house, Edna Edwards received a warranty deed from the sellers granting the property to Edna Edwards and Joe Edwards, "with right of survivorship." *Id.* at 847. Based on the language of the deed, Joe Edwards argued that he had owned the property with his mother "as a joint tenant with right of survivorship," and therefore became the sole owner of the property when his mother died. *Id.* But the Arkansas Supreme Court held that "a resulting trust was created for the benefit of Nancy Edwards, rendering the wording of the deed moot." *Id.* at 848. The court held that Joe Edwards held the property in a purchase-money resulting trust, because Edna Edwards had paid all of the purchase price for the property, and "the evidence pointed unerringly to the conclusion that Edna Edwards did not intend for Joe [Edwards] to have any beneficial interest under the deed, but was to act in the role of administrator or trustee of the property in case of her death so that the property could be distributed according to her will, specifically, to her four children equally subject to a life estate to Nancy [Edwards]." *Id.* at 849-50.

While *Edwards* involved only a purchase-money resulting trust, it described implied

trusts, including "resulting trusts," in broad language that arguably suggests that there can be a retained-interest implied trust of the type the Defendants assert. The district court quoted some of this language from *Edwards* in its opinion, but a fuller quotation is instructive. *Edwards* stated:

> **The term "implied trust" encompasses both constructive trusts and various types of resulting trusts**. *See* 76 Am.Jur.2d *Trusts* §§ 159-163 (1992); W. Fratcher, V Scott on Trusts §§ 404 through 404.2 (1989) (**describing the three types of resulting trusts**) and § 462 (describing constructive trusts). *Hickman v. The Trust of Heath, House & Boyles,* 310 Ark. 333, 835 S.W.2d 880 (1992); *Andres v. Andres,* 1 Ark.App. 75, 613 S.W.2d 404 (1981). . . .
>
> **A resulting trust arises where one disposes of property under circumstances which raise an inference that he/she does not intend that the putative grantee should have the beneficial interest in the property**. *Scott, supra* at § 404.1. There are different types of resulting trusts but that which concerns us here is often called a purchase money resulting trust . . . .
> . . . .
>
> The distinction between a resulting and a constructive trust is discussed in *Scott:*
>
>> A resulting trust is to be distinguished from a constructive trust. . . . **[A] resulting trust arises in favor of the person who transferred the property or caused it to be transferred under circumstances raising an inference that he intended to transfer to the other a bare legal title and not to give him the beneficial interest.**
>
> *Scott, supra* at § 404.2.

843 S.W.2d at 848-49 (emphasis added).

Arguably, the Defendants' legal theory is supported by the above broadly worded statements about when a resulting trust may arise, both in *Edwards* and in that case's quotation

of the *Scott* treatise on trusts. But an argument can be made that neither *Edwards* nor the *Scott* treatise permits finding a resulting trust in the situation involved in this case. As quoted above, *Edwards* cited with approval the *Scott* treatise, as "describing the three types of resulting trusts." But none of those "three types of resulting trusts" described by *Scott* can possibly apply in this case. The *Scott* treatise states:

> There are three situations in which the trust that arises is properly called a resulting trust:
>
> (1) where an express trust fails in whole or in part;
>
> (2) where an express trust is fully performed without exhausting the trust estate;
>
> (3) where property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another person.
>
> In each of these cases there is an inference that the person taking title to the property is not intended to have the beneficial interest, and in each of these cases the inference arises from the character of the transaction.

V Austin Wakeman Scott & William Franklin Fratcher, The Law of Trusts § 404.1 (4th ed. 1989). The first two of these three resulting trust situations requires there to have been an express trust, and there was no such express trust in this case. The third of these resulting trust situations is the purchase-money resulting trust, which is what was involved in *Edwards*, and which many Arkansas cases have recognized. But as discussed in Part VII.A.3.a of this Opinion above, the requirements for a purchase-money resulting trust clearly are not met in this case.

Thus, the *Scott* treatise cited by *Edwards* undermines, rather than supports, the Defendants' legal theory of a retained-interest implied trust. And this is made even clearer later

31

in the same section in the *Scott* treatise, where it further undercuts the Defendants' legal theory:

> Where the owner of property gratuitously transfers it to another
> without declaring any trust, a resulting trust **does not arise**. . . . [A]
> resulting trust **does not arise** where property is gratuitously
> transferred by the owner without declaring any trust.

*Id.* (emphasis added).

A decision of the Arkansas Supreme Court that preceded *Edwards*, and at least one Arkansas Court of Appeals case decided after *Edwards*, seemed to limit resulting trusts to the three situations listed in the *Scott* treatise, quoted above. In *Bottenfield v. Wood*, 573 S.W.2d 307 (Ark. 1978), the Arkansas Supreme Court considered a deed in which a mother conveyed land to three relatives "as Trustees," and the court ruled that the deed did not create an express trust, "because it violates the statute of frauds." 573 S.W.2d at 308-09 (citations omitted). The court then refused to find that there was a resulting trust, holding as follows:

> We find no evidence to support a finding that the trust would be a
> resulting trust. A resulting trust arises in one of the following
> situations: where a private or charitable trust fails in whole or in
> part; where a private or charitable trust is fully performed without
> exhausting the trust estate; and, where property is purchased and
> the purchase price is paid by one person and at his direction the
> vendor transfers the property to another person. *Restatement
> (Second) of Trusts*, § 404 (1959).

*Id.* at 309.

In the case of *Bradford v. Cossey*, No. CA 06-343, 2006 WL 3734686, at *4-5 (Ark. Ct. App. Dec. 20, 2006), after reciting the broad wording about resulting trusts from the *Edwards* case, the Arkansas Court of Appeals cited and applied the above holding in *Bottenfield*. The *Bradford* case therefore indicates that even after *Edwards*, a resulting trust is limited to the three situations described in *Bottenfield*.

32

The Restatement (Second) of Trusts, cited with approval by the Arkansas Supreme Court in *Bottenfield*, also seems to undermine the Defendants' legal theory, in at least one respect. Restatement (Second) of Trusts § 405, which is similar to one of the passages from the *Scott* treatise, quoted above, states:

> Where the owner of property transfers it without declaring any trust, the transferee does **not** hold the property upon a resulting trust although the transfer is gratuitous.

Restatement (Second) of Trusts, § 405 (1959) (emphasis added). And comment a. to § 405 states, in relevant part,

> Where a transfer of property is made without consideration, the inference is that the transferor intends to make a gift to the transferee, **not** that he intends that the transferee should hold the property for the benefit of the transferor. This is true even though it appears in the instrument of conveyance that no consideration is paid for the conveyance.

Restatement (Second) of Trusts, § 405, Comment a. (emphasis added).

All of the foregoing casts some doubt on the Defendants' legal theory. But that legal theory — that Arkansas law recognizes that there can be a retained-interest implied trust — is strongly supported by the most recent Arkansas appellate decision on the subject, namely, *McNeill v. Robbins*, No. CV-13-447, 2014 WL 1396655 (Ark. Ct. App. Apr. 9, 2014).[48] The Court will describe that case in some detail, because it is like this case in several ways, and it affirmed the finding of an implied trust of the kind the Defendants allege in this case.

*McNeill* involved a dispute between a mother and her son over ownership of six parcels

---

[48] Although *McNeill* was not published in the Southwestern Reporter, under Arkansas court rules, it is precedential. *See* Ark. Sup. Ct. R. 5-2(c).

of real estate.  The mother had purchased the parcels, and then had been the sole owner of the

parcels for several years.  Then in 2004 she conveyed the properties to herself and her son, as

joint tenants with right of survivorship.  Seven years after that, the son filed an action to partition

the properties.  The mother opposed the partition action, claiming that she was the sole owner of

the properties.  She claimed that she had added the son's name to the deeds "to allow him to gain

credit to purchase other property and to pass the property to him outside of probate upon her

death."  2014 WL 1396655, at *1.  The "[trial] court found that, by placing [her son's] name on

the deeds, [the mother] did not intend for [her son] to have any beneficial interest but to act as an

administrator if she died."  *Id.*  The trial court found that a constructive trust existed, or in the

alternative, that the mother "retained ownership of the property due to a resulting trust," and

ordered that the 2004 deeds be set aside.  *Id.*

On appeal, the Arkansas Court of Appeals affirmed the trial court decision, on the basis

that there was an implied trust in the form of a resulting trust.  The court cited the *Edwards* case

for the broad proposition that "[a] resulting trust arises when one disposes of property under

circumstances raising an inference that he or she does not intend that the putative grantee should

have a beneficial interest in the property."  *Id.* at *2.  The court also cited *Edwards* for the

proposition that "[i]n general a resulting trust must be proved by clear and convincing evidence."

*Id.*

The court of appeals ruled that the trial court's findings were not clearly erroneous, and

supported the finding of a resulting trust.  The court cited evidence that the son paid no part of

the purchase price for the properties, never reported the rental income from the properties on his

tax returns, never found rental tenants or signed the leases for the properties, never paid the taxes

or insurance premiums for the properties, and never paid the expenses for the properties. Rather, all the payments came from the mother. *Id.* at *2.

The court of appeals also cited the mother's testimony:

> [The mother] testified that she had transferred the six properties from her name to joint ownership with [the son] to assist him in building capital and procuring other properties on his own and **that she never intended to** create a partnership with him or **provide him with a present legal interest in the properties.** When [the son's] purchase of other properties did not materialize, [the mother] explained, **she left his name on the properties "because he would have inherited it anyway." She testified that she still intended for [her son] to inherit the properties in full but did not want to give up her present interest in them.**

*Id.* (emphasis added).

The court of appeals held that the trial court's findings were not clearly erroneous, and affirmed the finding of a resulting trust:

> In its order, the circuit court found that [the mother] had no intention of transferring present legal title or a beneficial interest to her son when she transferred the properties from her sole name to a joint tenancy, as evidenced by the parties' treatment of the properties over the next seven years. **The court concluded that a resulting trust was created, that [the son's] only interest in the property was as a trustee** . . . . Based on our deference to the [trial] court's resolution of disputed facts and determinations of credibility, we cannot say the court clearly erred in this finding. Therefore, we affirm on this point.

*Id.* (emphasis added).

Having affirmed the finding of a resulting trust, the court of appeals rejected the son's argument that the language in the deeds from his mother "clearly gave him an interest in the proper[ties]." *Id.* at *3. The court held that the argument "misses the point of what an implied trust is-an equitable remedy designed to disregard legal title." *Id.*

As *Edwards* and *McNeill* both show, the grantee under a deed may not defeat a claim of an implied trust, including a resulting trust, simply by relying on the unambiguous wording in the deed. And "[p]arol evidence of oral declarations or of the circumstances under which the transfer is made is admissible to show [the grantor's] intent." *Walker v. Hooker*, 667 S.W.2d 637, 642 (Ark. 1984) (case involving a purchase-money resulting trust) (citation omitted). And as shown by the descriptions above of the *Edwards* and *McNeill* cases, the court also may consider the testimony of the grantor himself/herself about what his/her intent was.

Arguably, *McNeill* took a broader view about resulting trusts than is warranted under the Arkansas Supreme Court's decision in *Edwards*, for the reasons discussed above. But it is also arguable that *McNeill* is a correct reading of *Edwards*, given the *Edwards* court's broad statement of when a resulting trust arises, quoted above.[49] In determining what Arkansas law is on this subject, this Court must predict what the Arkansas Supreme Court would hold. *See, e.g., Kasishke v. Frank* (*In re Frank*), 425 B.R. 435, 439 n.4 (Bankr. W.D. Mich. 2010). In making this prediction, this Court should not disregard the decision of the Arkansas Court of Appeals in *McNeill*, unless there is "persuasive data" that the Arkansas Supreme Court would decide differently. *See id.* (citation omitted). *McNeill* is the only Arkansas appellate decision after *Edwards* that is on point, and this Court is persuaded that *McNeill* is the best indicator of what the Arkansas Supreme Court would hold. The Trustee has not presented any persuasive reason to disregard *McNeill*. As a result, the Court concludes that Arkansas law *does* recognize that

---

[49] "A resulting trust arises where one disposes of property under circumstances which raise an inference that he/she does not intend that the putative grantee should have the beneficial interest in the property." *Edwards,* 843 S.W.2d at 849 (citation omitted).

there can be a retained-interest implied trust, although called a resulting trust.  The Defendants'

legal theory is valid under Arkansas law.

The Court also notes that while not directly binding, there are cases cited by the

Defendants that apply the law of other jurisdictions, and that recognize the Defendants' retained-

interest resulting trust theory.  In one such case, for example, the Arizona Supreme Court held:

> While ordinarily a resulting trust arises either upon the failure of an
> express trust or where property is transferred by the grantor to a
> third party at the request of the one who pays the purchase price,
> **yet it not infrequently has been held to arise when a transfer
> without consideration is made, with the understanding and
> agreement that the grantee holds the legal title only for the
> benefit of the grantor**.  Kingsbury v. Christy, 21 Ariz. 559, 192 P.
> 1114; Case Threshing Mach. Co. v. Walton Trust Co., 39 Okl. 748,
> 136 P. 769; Hunnicutt v. Oren. 84 Kan. 460, 114 P. 1059; Flesner
> v. Cooper, 39 Okl. 133, 134 P. 379; Gray v. Beard, 66 Or. 59, 133
> P. 791.

*Collins v. Collins*, 52 P.2d 1169, 1174 (Ariz. 1935) (emphasis added).

In a case applying Pennsylvania law, a bankruptcy court found a resulting trust to exist on

facts similar to those in this case.  That decision was affirmed by both the district court and the

Third Circuit Court of Appeals.  *Stewart v. Shubert* (*In re Stewart*), 368 B.R. 445 (Bankr. E.D.

Pa. 2007), *aff'd.*, No. 07-2283, 2008 WL 938920 (E.D. Pa. Apr. 4, 2008); *aff'd.*, No. 08-2360,

325 Fed. App'x. 82 (3d Cir. Apr. 27, 2009).  In that case, the bankruptcy debtor's mother

transferred real estate she had owned for many years to the debtor, by giving him a deed

conveying ownership of the property.  368 B.R. at 447.  In the bankruptcy court, the debtor and

his mother alleged that the mother had transferred the property to her son "for estate planning

purposes only and that she did not intend to transfer her beneficial interest in the [p]roperty to the

[d]ebtor." *Id.*  Rather, the mother told her son that the property "'would remain hers until she

died.'" *Id.* at 448 n.4, 454 n.18 (record citations omitted). After a trial, the bankruptcy court

found these allegations to be true. After discussing Pennsylvania case law and relevant

provisions of the Restatement (Second) of Trusts, the bankruptcy court ruled that the debtor had

obtained the property subject to a resulting trust in favor of his mother, such that "the [d]ebtor

did not have any beneficial interest in the [p]roperty." *Id.* at 454. Rather, at most, the debtor had

obtained only a "bare legal interest" in the property. *Id.*.

### 4. Application of Defendants' legal theory to the evidence in this case

For the reasons stated above, the Court concludes that Arkansas law recognizes a

retained-interest implied trust of the kind alleged by the Defendants in this case. The question

then becomes whether the evidence presented at trial supports finding such an implied trust in

this case.

### a. Defendants' burden and the rebuttable presumption against their position

In considering the evidence, the Court is mindful of two further points about Arkansas

law. First, as noted above, the *Edwards* and *McNeill* cases held that a party alleging an implied

trust, such as a resulting trust, must prove such trust by "clear and convincing evidence."

*Edwards*, 843 S.W.2d at 849; *McNeill*, 2014 WL 1396655, at *2. In discussing implied trusts in

the specific context of a constructive trust, the Arkansas Supreme Court has described the burden

this way:

> To impose a constructive trust, there must be full, clear, and
> convincing evidence leaving no doubt with respect to the necessary
> facts, *Tillar v. Henry*, 75 Ark. 446, 88 S.W. 573 (1905), and the
> burden is especially great when a title to real estate is sought to be
> overturned by parol evidence. *Nelson v. Wood*, 199 Ark. 1019, 137
> S.W.2d 929 (1940).

*Betts v. Betts*, 932 S.W.2d 336, 338 (Ark. 1996) (quoting *Nichols v. Wray*, 925 S.W.2d 785, 789 (Ark. 1996)).

Arkansas cases have described "clear and convincing evidence" in this way:

> Clear and convincing evidence is evidence by a credible witness whose memory of the facts about which he or she testifies is distinct, whose narration of the details is exact and in due order, and whose testimony is so direct, weighty, and convincing as to enable the fact-finder to come to a clear conviction, without hesitation, of the truth of the facts related.

*Mason v. Mason*, 536 S.W.2d 657, 663 (Ark. Ct. App. 2017) (citation omitted).

Second, when the grantee of a deed is a spouse or child of the grantor, as in the present case, there is a rebuttable presumption that the grantor intended to give a gift of an equitable interest in the property to the spouse or child, such that no implied trust arises. For example, in a case discussing a purchase-money resulting trust, the Arkansas Supreme Court held:

> The party asserting a resulting trust has a heavy burden of proof, and when the parties involved are spouses or children of the one who pays the purchase price, the law presumes that the purchase and registration of legal title in the family members' names were intended as gifts by him to them since they are the natural objects of his affection and largess. That presumption[,] however, may be rebutted by evidence that the person who pays the purchase price did not intend for the transferee to have the beneficial interest in the property.

*Walker,* 667 S.W.2d at 642 (citations omitted). While the *Walker* case involved a purchase-money resulting trust, the same "heavy burden of proof" and rebuttable presumption logically apply in this case to the Defendants' assertion of a retained-interest implied trust.

**b. The evidence, and the Court's findings from the evidence**

The Court will consider the transfer made by Kathleen to Jason under the 2014 deed

separately from the transfer made by Christopher to Jason under the 2017 deed. Not only were these two deeds given by different people, but also the deeds were not given at the same time. The second of these deeds was given three years and four months after the first deed was given. And Kathleen did not even learn that Christopher had given the 2017 deed to Jason until well after the fact, in August 2018.[50] Moreover, while the wording of the two deeds was basically the same, the circumstances in which the deeds were given were different. Finally, the testimony of Kathleen and Christopher about their respective intentions was different.

### i. Kathleen's 2014 deed

Kathleen signed the 2014 deed on March 20, 2014, and it was recorded on March 24, 2014.[51] That warranty deed referred to Kathleen as "**single**," and conveyed Kathleen's property in Scott County, Arkansas, totaling roughly 251 acres, to "**Kathleen W. Sullivan and Jason Wylie, as joint tenants with full rights of survivorship, and not as tenants in common.**"[52]

Before giving Jason the 2014 deed, Kathleen's use of her Arkansas property was very limited. As noted in Part I of this Opinion, the property is only land, with no buildings on it. Kathleen did not live on the property; rather, she lived in New Mexico. The property was used by Christopher as part of his farming operation, and Christopher paid rent to Kathleen for this.[53] After Kathleen gave Jason the 2014 deed, none of these things changed. Neither Kathleen nor

---

[50] Testimony of Kathleen Sullivan (Tr. at 186-87).

[51] PX-2 at pp. 1, 3.

[52] *Id.* at p. 1 (bold in original).

[53] *See* Testimony of Kathleen Sullivan (Tr. at 152, line 13).

Jason had possession or use of the property, and neither of them paid rent to the other.

Kathleen testified that she decided to give Jason the 2014 deed after visiting him in the hospital in Michigan, in January 2014. At that time Jason had undergone major surgery for brain cancer.[54] Kathleen testified that Jason's surgery was on January 3, 2014, and that she "spent days in recovery with him at the hospital then," and that Jason "feared he was going to die."[55]

Kathleen testified that she had Christopher Sullivan contact a local attorney in Arkansas to draft the deed for her,[56] and that her intention in doing the 2014 deed was that Jason would get her property in Arkansas if she died before Jason did. Kathleen also testified that she gave that survivorship right to Jason when she did in order to give Jason hope to live. Kathleen testified:

> Q But you told Chris what you wanted. The attorney in Arkansas drew it up, mailed it to you, and you were good with the language in the deed other than the stuff you crossed out; right?
>
> A Correct.
>
> Q You were good with joint tenants with rights of survivorship; right?
>
> A Full rights of survivorship.
> . . . .
>
> Q Did you convey to the attorney that this was for estate planning

---

[54] *See* Testimony of Jason Wylie (Tr. at 4-6) (recounting his brain surgery in January 2014, after he had a grand mal seizure and was discovered to have a brain tumor; and his second brain surgery in May 2017); Testimony of Leah Wylie (Tr. at 122, line 9) (Jason had "brain cancer").

[55] Testimony of Kathleen Sullivan (Tr. at 138-39).

[56] Kathleen contacted Christopher Sullivan in Arkansas and asked him to get a local attorney, Donald Goodner, to prepare the deed. Kathleen did not talk to attorney Goodner herself, and in fact did not consult with any attorney before she gave Jason the 2014 deed. *Id.* (Tr. at 152, 159, 191). Goodner prepared the deed and Kathleen received it by mail in New Mexico, where she lived, signed it, and sent it back to Arkansas where it was recorded. *Id.* (Tr. at 153, 158).

41

purposes or anything?

A . . . I'm sure it had to do with being hopeful that Jason was going to recover. Yes. This would have been giving him hope to live that he would get this land in Arkansas if I died.
. . . .

Q . . . So that was the purpose for the transfer. He would have hope to live that he'd have something at the end of the day?

A You didn't have that conversation in the hospital with him. Yes. It was hope for him to live. I wanted him well. I loved him. He needed to have some hope. That's all I could offer is that hope.[57]

Kathleen understood that by making Jason a joint tenant with her with the full right of survivorship in the 2014 deed, "whoever dies first, the other person gets" the property.[58] She referred to the 2014 deed as having given Jason an "early inheritance" of her Arkansas property,[59] and she testified:

Q . . . [Y]ou came up with that idea that you would add [Jason] to the title?

A That's what you do for inheritance reasons as one way of doing it in Arkansas and in Michigan, and I chose that without consulting a lawyer.[60]

As noted above, Kathleen was unmarrried, and Jason was her only child. At the time of trial, Kathleen was 72 years old, and Jason was 49 years old.[61] Kathleen chose to use the 2014

---

[57] Testimony of Kathleen Sullivan (Tr. at 156, 158-59).

[58] *See id.* (Tr. at 153, 154 lines 3-5).

[59] *See id.* (Tr. at 182, lines 22-24).

[60] *Id.* (Tr. at 191).

[61] *Id.* (Tr. at 151); Testimony of Jason Wylie (Tr. at 2).

42

deed, rather than some other means, as her way of making Jason the owner of her Arkansas property if and when she died before Jason did. Kathleen wanted to accomplish this without the need for any probate proceedings, and without the need for a will, or a trust, or any other form of estate planning. In 2014, Kathleen had no will, trust, or other estate plan, and as of the time of trial she still did not have any of those things.[62] Kathleen had an aversion to wills and formal trusts. She testified that her parents had died in the early 2000's, with a will and a trust, and she testified that "I'll never go through that crap again."[63]

Kathleen did not intend or consider that she had given Jason a present ownership interest in the Arkansas property. She testified that she viewed the property as "still my land."[64] She did not intend for Jason to go to Arkansas and live there, or for Jason to have power to sell or mortgage half the property.[65]

The Court finds that in giving Jason the 2014 deed, Kathleen did not intend to give Jason any present beneficial or equitable ownership of her Arkansas property. Rather, Kathleen intended only to give Jason the right to inherit the property if and when Kathleen died before Jason did. Under the 2014 deed, as long as Kathleen was alive, however, Jason held only *legal* title, and that was only as a trustee for Kathleen's benefit.

These findings are further supported by Jason's testimony. Jason Wylie testified as

---

[62] Testimony of Kathleen Sullivan (Tr. at 178).

[63] *Id.* (Tr. at 137, 178).

[64] *Id.* (Tr. at 183).

[65] *Id.* (Tr. at 184-85).

43

follows about the 2014 deed from his mother Kathleen Sullivan. First, he did not have any

conversations with attorney Goodner about the deed.[66] Second, he did not give his mother any

money for the transfer.[67] And third, his mother gave this deed "strictly for estate reasons," and

Jason discussed that with Kathleen at the time. Jason testified:

> Q  And would you agree your mother transferred one-half of her property interest in this Arkansas property to you for no consideration?
>
> A  For estate reasons.
>
> Q  Estate reasons?
>
> A  Yeah.
>
> Q  How do you know that?
>
> A  Because I'm not moving to Arkansas.
>
> Q  Other than you not wanting to go to Arkansas and you don't like the heat, any other reason?
>
> A  It was strictly for estate because she didn't want to do a will or a trust.
>
> Q  Did she tell you that?
>
> A  Yeah.
>
> Q  When did she tell you that?
>
> A  When we did this stuff . . . .
>
> Q  Is there any e-mail from her, any letter, any will, any trust that gives you direction on what to do with this property?

---

[66]  Testimony of Jason Wylie (Tr. at 12).

[67]  *Id.* (Tr. at 45).

A  No.

. . . .

A  [The Arkansas property] wasn't gifted to me. . . . It wasn't gifted
to me.  It was strictly for estate reasons.[68]

The testimony of Jason's wife, the Debtor Leah Wylie, also supports Kathleen's position.

Leah Wylie testified that Jason "didn't have land in Arkansas,"[69] and as follows:

Q  When Kathleen Sullivan first added Jason to the title to her land
in Arkansas, were you aware that that happened?

A  Yes.

Q  How did you become aware of that?

A  We talked about it.

Q  At that time, did you feel that Jason had become a land owner in
Arkansas?

A  No.

Q  Did you ever have any thought of moving to Arkansas?

A  No.

Q  Did you ever have any thought of making money from it?

A  No.

Q  Did you ever get paid rent?

A  No.

Q  Did you ever -- did you or Jason ever pay expenses associated
with the property?

---

[68]  *Id.* (Tr. at 14-15, 44).

[69]  Testimony of Leah Wylie (Tr. at 125, line 8).

A  No.

Q  Did you ever go down there and work on the property?

A  No.[70]

The Court has considered the Trustee's argument about the Arkansas statute permitting the use of what is known as a beneficiary deed.  The Court briefly described the Arkansas beneficiary deed statute in its second summary judgment opinion, as noted in Part VI.A.2 of this Opinion.  There the Court noted,

> Under Arkansas law, it was and is possible, and would have been effective, to give a "beneficiary deed," which "is a deed without current tangible consideration that conveys upon the death of the owner an ownership interest in real property . . . to a grantee designated by the owner and that expressly states that the deed is not to take effect until the death of the owner."  Ark. Code Ann. § 18-12-608(a)(1)(A).  The 2014 and 2017 warranty deeds did not include this language, and therefore were not beneficiary deeds.[71]

The Trustee argues that if Kathleen's intent in 2014 truly had been limited to giving Jason only a survivorship right, so that he would own the property only when and if Kathleen died before he did, then attorney Goodner would have drafted, and Kathleen would have used, a beneficiary deed.  The fact that they used a joint tenancy/survivorship deed instead, the Trustee argues, shows that Kathleen actually intended to give Jason a present beneficial one-half interest in her property, with and subject to the right of survivorship.

Arguably, such a beneficiary deed would have fit Kathleen's asserted purpose more explicitly than did the 2014 deed she gave Jason.  Under the Arkansas beneficiary deed statute,

---

[70]  *Id.* (Tr. at 128).

[71]  *Miller v. Sullivan*, 654 B.R. at 461 n.41.

46

which was the same in 2014 as it is now, Kathleen could have given Jason a deed that said that "[f]or a non-monetary, intangible consideration, of value to [me], I . . . hereby convey to [Jason Wylie] effective on my death the following described property: . . . ." *See* Ark. Code Ann. § 18-12-608(g). That would have been sufficient to "transfer[] [Kathleen's property] interest to [Jason] effective upon the death of [Kathleen]," subject to liens and encumbrances made by Kathleen prior to her death. *See* Ark. Code Ann. § 18-12-608(a)(1)(B)(i). Such a beneficiary deed would have been revocable by Kathleen "at any time," by her signing and recording a written revocation. *See* Ark. Code Ann. §§ 18-12-608(d)(1), 18-12-608(d)(2). If Kathleen had used a beneficiary deed, it would be clear that she had given Jason no legal or equitable interest in her property until her death. The statute says that "[n]o legal or equitable interest shall vest in the grantee until the death of the owner prior to revocation of the beneficiary deed." Ark. Code Ann. § 18-12-608(a)(1)(B)(ii).

The Trustee argues that Kathleen's use of the joint tenancy/survivorship form of the 2014 deed that she gave Jason, combined with her failure to use a beneficiary deed, raises a strong inference that Kathleen intended Jason to have a present legal and equitable ownership interest in the property, not just a right of survivorship. This inference is a strong one, the Trustee argues, because Kathleen used an Arkansas real estate attorney, Donald Goodner, to draft the 2014 deed, and presumably attorney Goodner knew about the Arkansas beneficiary deed statute.

The Court does not draw the inference argued by the Trustee, however, for several reasons. First, there was no evidence presented about what attorney Goodner knew or thought about beneficiary deeds. (The Trustee did not present any deposition or trial testimony from

47

attorney Goodner, for example.)  Second, Kathleen did not talk to attorney Goodner, or any other attorney, before she obtained and signed the 2014 deed.[72]  Rather, Kathleen requested Goodner's preparation of a deed through Christopher Sullivan.

Third, Kathleen did not know about beneficiary deeds.  The evidence shows that Kathleen had some knowledge of and experience with real estate.  Years before trial, she had worked as a licensed real estate agent in Michigan, and she also had worked for the U.S. Department of Agriculture in a job that involved "[l]ooking at surveys and deeds to divide off developments and ten-acre parcels from farms."[73]  Kathleen was not an attorney, however, and there is no evidence that she actually had any knowledge about Arkansas law.  She testified specifically that she did not know what a beneficiary deed is.[74]  Jason Wylie also did not know what a beneficiary deed is.[75]

Fourth, the Arkansas beneficiary deed statute states that it "does not prohibit other methods of conveying real property that are permitted by law and that have the effect of postponing enjoyment of an interest in real property until the death of the owner."  Ark. Code Ann. § 18-12-608(f)(1).

For all of the foregoing reasons, the Court does not draw any inference adverse to Kathleen from her failure to use a beneficiary deed in 2014.

---

[72]  Testimony of Kathleen Sullivan (Tr. at 191).

[73]  Testimony of Kathleen Sullivan (Tr. at 150-51, 153).

[74]  *Id.* (Tr. at 158).

[75]  Testimony of Jason Wylie (Tr. at 10).

The Court finds the testimony described above, by Kathleen Sullivan, Jason Wylie, and Leah Wylie, to be credible, and the Court believes it.

Kathleen Sullivan has proven, by clear and convincing evidence, the existence of an implied trust under the 2014 deed she gave to Jason Wylie. This implied trust was such that Jason had *legal* title only to an undivided one-half interest in Kathleen's Arkansas property, and Jason held that legal title only as a trustee, for the benefit of Kathleen. Jason had no beneficial or equitable interest in Kathleen's Arkansas property.

Furthermore, Kathleen has successfully rebutted the presumption under Arkansas law that she made a gift of an equitable interest in the property to her son Jason.

On these points, the Court finds the evidence in Kathleen's favor to be clear and convincing, as that standard is defined by Arkansas case law, quoted in Part VII.A.4.a of this Opinion. And as to Kathleen's 2014 deed, this case is similar to the *McNeill* case, which the Court has described in detail in Part VII.A.3.c of this Opinion, above. As described above, in *McNeill*, a mother gave six deeds to her son that were like Kathleen's 2014 deed to Jason, in that they conveyed the mother's real estate to herself and her son, as joint tenants with a right of survivorship. Despite this, the trial court found from the evidence that the mother did not intend for her son to have any beneficial interest in the properties, and found that the mother retained ownership of the property due to a constructive trust, or in the alternative, due to a resulting trust. The Arkansas Court of Appeals affirmed, on the ground that there was a resulting trust in favor of the mother. The court of appeals cited, among other evidence, the mother's testimony that she "intended for [her son] to inherit the properties in full but did not want to give up her present

49

interest in them." *McNeill*, 2014 WL 1396655, at *2.

The son in the *McNeill* case was found to have no beneficial or equitable interest in the properties at issue, even though his mother's deeds to him gave him a right of survivorship. That survivorship right was not deemed sufficient to give the son any beneficial or equitable interest in the properties; rather, the court of appeals held, the son's "only interest was as a trustee." *See id.*

So it is in this case. Applying Arkansas law to the facts and evidence in this case, the Court concludes that Jason obtained no interest in Kathleen's Arkansas property other than "as a trustee" under an implied trust, the beneficiary of which was Kathleen.

### ii. Christopher's 2017 deed

Christopher Sullivan signed the 2017 deed on July 12, 2017, and it was recorded that same day.[76] That warranty deed referred to Christopher as "**single**," and conveyed Christopher's property in Scott County, Arkansas, totaling 117.5 acres, to "**Christopher M. Sullivan and Jason Wylie, as joint tenants with rights of survivorship, and not as tenants in common**."[77]

Christopher Sullivan was 74 years old at the time of trial.[78] He has no children other than Jason, his adopted son.[79] And although the 2017 deed listed Christopher as "single," at the time Christopher actually was married, to Daisy Sullivan. They had married in 2013, and are still

---

[76] PX-3 at pp. 1, 2.

[77] *Id.* at p. 1 (bold in original).

[78] Testimony of Christopher Sullivan (Tr. at 72).

[79] *Id.* (Tr. at 70-71).

married.[80]  Christopher has a will, in which he leaves his property to Daisy, except for a couple of pieces of equipment that he leaves to Jason; Christopher has no estate planning trust.[81]

Before giving Jason the 2017 deed, Christopher had lived on the property, and used it, along with Kathleen's property, in his cattle farming operation.[82]  After Christopher gave Jason the 2017 deed, none of that changed.

Christopher and Jason both testified that the 2017 deed was given for "estate reasons."[83] According to both Christopher and Jason, Christopher did not even intend for Jason to inherit the property on Christopher's death.  Rather, they testified, Christopher's only purpose and intent was that if he died, Jason would have control of the property for the benefit of Christopher's wife Daisy, and would help Daisy manage the property and decide what to do with it.

Christopher Sullivan testified that he hired Donald Goodner, a local real estate attorney in Arkansas, to draft the 2017 deed.[84]  Christopher initially testified that does not remember what he told attorney Goodner about preparing this deed; and that he does not know if he told Goodner that he wanted the deed for estate planning purposes.[85]  Christopher does not remember whether attorney Goodner suggested to him that he use a beneficiary deed.  Christopher then testified that he does not remember whether he told attorney Goodner that he wanted the deed as joint tenants

---

[80]  *Id.* (Tr. at 71-72).

[81]  *Id*. (Tr. at 93-95).

[82]  *See id.* (Tr. at 72).

[83]  *See id.* (Tr. at 85-86, 100-03); Testimony of Jason Wylie (Tr. at 10).

[84]  Testimony of Christopher Sullivan (Tr. 81, 84).

[85]   *Id.* (Tr. at 81-82).

with a right of survivorship.[86]  But Christopher understands that "when you own property as joint tenants with full rights of survivorship that when one person dies, the property goes to the other person."[87]  Jason did not pay Christopher anything for the 2017 deed; no money exchanged hands.[88]

From the wording of the 2017 deed, it is obvious that it is patterned after the 2014 deed that Christopher had arranged for attorney Goodner to draft for Kathleen.  Later in his testimony, Christopher's memory improved about talking to attorney Goodner about the 2017 deed.  He testified this way:

> Q  . . . At the time that you added Jason to the title of your Arkansas property, was it Goodner that prepared the document that --
>
> A  Yes.
>
> Q  . . . Did you go to Mr. Goodner and ask him for the best way to do an estate plan?
>
> A  Yeah.  He just told me the best way to make a simple transfer of property, chattel, whatever, to whoever I wanted to. . . . It's the quickest, cheapest, easiest way to transfer items, personal items basically.[89]

Christopher testified as follows, about his intent in doing the 2017 deed:

> Q  When you transferred this property to Jason, did you intend to transfer him half the property?

---

[86]  *Id.* (Tr. at 83).

[87]  *Id.*

[88]  *Id.* (Tr. at 85).

[89]  *Id.* (Tr. at 100-01).

A No.

Q What did you intend to do?

A What do you mean, what did I intend to do? If something happened to me, he would have control of it.[90]

Q . . . When you added Jason to the title, was it your intention that upon your death he would come down to Arkansas and kick Daisy off the land and say, "It's mine," and sell it and keep --

A No, no. It was never -- at that time, there was never any thought of that, no intentions.

Q Did you have some intent that he would take care of Daisy --

A Right.
. . .

Q That he would, as I think you said, manage the property for her or sell it on her --

A Right. He would know what to do so the vultures just didn't move in and take over her.

Q Is Daisy not experienced in land ownership?

A No.

Q And does Daisy buy and sell land?

A No.

Q So she's not experienced in that type --

A Correct.

Q -- of thing?

A Correct.

---

[90] *Id.* (Tr. at 85-86).

Q  And was it your feeling that Jason is experienced in that type of thing?

A  Much more so than she would have been.

Q  Was Jason someone you could rely upon?

A  At that time, yes.

. . . .

Q . . . [A]t the time you added Jason to title the property, was it your understanding or intention that he could sell half of it and take the money?

A  No.

Q  Was it your understanding that he could mortgage half of it or all of it?

A  [No].

Q  Did you think he would do that?

A  No.

Q  Did you trust Jason?

A  Yeah.

Q  A lot?

A  Yeah.

. . . .

Q  Did you trust him to do the right things?

A  Correct.

Q  And what was that right thing?

A  That they would decide, him and -- he could help Daisy decide what she wanted to do and then what they would do with the

54

property.[91]

Christopher testified that Jason did not pay him anything for the Arkansas property; that Jason never farmed that property; Christopher never paid Jason any rent; and Jason did not help pay for taxes on the property.[92]

Jason's testimony about the 2017 deed corroborates what Christopher says about his intent, and Jason testified that he and Christopher actually discussed that intent at the time of the 2017 deed. Jason testified that he was in Arkansas visiting with his father at the time, and that they went to attorney Goodner's office, and that the only discussion at Goodner's office was "[t]hat we were just doing it for estate reasons is all we were there for."[93] Jason testified that he and his father then took the deed to the local register of deeds to record it.[94] (As noted above, the deed shows that it was recorded on July 12, 2017.) Although the deed recites that it was "in consideration of the sum of Ten Dollars ($10.00) and other consideration,"[95] Jason did not pay $10.00, and there was no money exchanged.[96]

Jason testified that he does not know why the deed says that the property was conveyed to Christopher and Jason "as joint tenants with right of survivorship and not as tenants in

---

[91] *Id.* (Tr. at 101-03).

[92] *Id.* (Tr. at 103-04).

[93] Testimony of Jason Wylie (Tr. at 9, 56-57).

[94] *Id.* (Tr. at 8-9).

[95] *See* PX-3 at p. 1.

[96] Testimony of Jason Wylie (Tr. at 7, 9-10, 45).

55

common."[97]  Jason testified that he did not discuss with attorney Goodner doing the deed in a

different form, and that he does not know what a "beneficiary deed" is.[98]

Jason further testified as follows about the deed:

> Q  Did you discuss any other way to formulate the deed other than
> what was filed with the register of deeds in Arkansas?
>
> A  No, because my father done the same thing with his brother, so
> he just thought it was the right thing to do.
> . . . .
>
> Q  Was it your understanding you were receiving half interest in
> the property?
>
> A  No.  I have nothing to do with Arkansas.
>
> Q  . . .  What was your understanding?
>
> A  For estate reasons.  If he dies, I would take care of his wife,
> would take care of their property.
>
> Q  Is that written anywhere?  Is that in any agreement, e-mail,
> document, anything like that?
>
> A  No.
>
> Q  Is there a will or trust you're aware of that obligates you to do
> that?
>
> A  No.
>
> Q  Nothing; right?
>
> A  Not that I'm aware of.  It's just what he told me I had to do.
>
> Q  And when did he tell you that?

---

[97]  *Id.* (Tr. at 7).

[98]  *Id.* (Tr. at 10).

A  When we did this.

Q  In July of 2017?

A  Yeah.[99]

Jason further testified that after his father signed the 2017 deed, Jason's father paid no rent to him, and Jason paid no taxes on the Arkansas property.[100] And Jason continued to live, farm, and work in Michigan.[101]

The Court finds the testimony of Christopher Sullivan and Jason Wylie, about Christopher's intent in giving Jason the 2017 deed and Jason's understanding of that intent, to be credible, and the Court believes it.

The Court finds that in giving Jason the 2017 deed, Christopher did not intend to give Jason any present beneficial or equitable ownership of his Arkansas property. Rather, Christopher intended only to give Jason control of the property, in order to administer it for Daisy Sullivan's benefit, if and when Christopher died before Jason did. Under the 2017 deed, as long as Christopher was alive, however, Jason held only legal title, and that was only as a trustee for Christopher's benefit.

Christopher Sullivan has proven, by clear and convincing evidence, the existence of an implied trust under the 2017 deed he gave to Jason Wylie. This implied trust was such that Jason had *legal* title only to an undivided one-half interest in Christopher's Arkansas property, and

---

[99]  *Id.* (Tr. at 10-11).

[100]  *Id.* (Tr. at 45, 58).

[101]  *Id.* (Tr. at 57).

Jason held that legal title only as a trustee, for the benefit of Christopher (during his life) and Daisy Sullivan (after Christopher's death). Jason had no beneficial or equitable interest in Christopher's Arkansas property.

Furthermore, Christopher has successfully rebutted the presumption under Arkansas law that he made a gift of an equitable interest in the property to his adopted son Jason.

On these points, the Court finds the evidence in Christopher's favor to be clear and convincing, as that standard is defined by Arkansas case law, quoted in Part VII.A.4.a of this Opinion. As to Christopher's 2017 deed, as with Kathleen's 2014 deed, this case is similar to the *McNeill* case, described above. In the case of Christopher's 2017 deed, however, the nature of the implied trust is somewhat different than with Kathleen's 2014 deed.

On the one hand, as discussed above, Kathleen's 2014 deed was given with the intent that Jason Wylie would inherit Kathleen's Arkansas property if and when Kathleen died before Jason did. On the other hand, Christopher's 2017 deed was given not with any intent that Jason would ever inherit Christopher's Arkansas property, but rather only with the intent that Jason would administer that property for the benefit of Christopher's wife, Daisy Sullivan, after Christopher died. In that regard, the situation with Christopher's 2017 deed is analogous to the situation in the *Edwards* case, the Arkansas Supreme Court case discussed in Part VII.A.3.c of this Opinion. *Edwards v. Edwards*, 843 S.W.2d 846 (Ark. 1992). *Edwards* was a purchase-money resulting trust case, but it is instructive here by analogy. In *Edwards*, a mother purchased a home and had it deeded to herself and her son, "with right of survivorship." *Id.* at 847. After the mother died, the son claimed to be the sole owner of the property. But the trial court found from the evidence

58

that the mother had not intended for her son to have any beneficial interest in the property under the deed. Rather, the trial court found, the mother intended for her son only to act in the role of an administrator or trustee, so that the property could be distributed according to the mother's will, for the benefit of all four of her children equally. *See* 843 S.W.2d at 840-50. The Arkansas Supreme Court affirmed the trial court's findings, and held that the son had no beneficial interest in the property under the survivorship deed.

As with the survivorship deed in the *Edwards* case, Christopher's 2017 deed gave Jason no beneficial interest in Christopher's Arkansas property. Jason's only interest in that property was as a trustee under an implied trust, for the benefit of Christopher Sullivan and Daisy Sullivan.

**B. Given the Court's implied trust findings, the Trustee cannot avoid or recover either of the 2018 Transfers.**

**1. The Trustee's constructive fraudulent transfer claim fails.**

For the reasons discussed above, Jason Wylie had no beneficial or equitable interest in the Arkansas properties, under Kathleen's 2014 deed or Christopher's 2017 deed. Instead, he had only a legal interest in the properties, which he held under an implied trust, as trustee for the benefit of Kathleen Sullivan with respect to Kathleen's Arkansas property, and as trustee for the benefit of Christopher Sullivan and Daisy Sullivan with respect to Christopher's Arkansas property. To the extent that Leah Wylie had any interest in either of the Arkansas properties, it was derivative of Jason's interest, and therefore was subject to the same implied trusts as Jason's interests.

It follows that the 2018 Transfers, by which Jason Wylie and Leah Wylie transferred their

interests in the Arkansas properties back to Kathleen Sullivan and Christopher Sullivan, cannot be avoided as fraudulent transfers under 11 U.S.C. § 548. The 2018 Transfers transferred nothing of value, because they merely transferred legal interests of Jason (and perhaps Leah) that had no value.

Because those legal interests had no value, the Trustee cannot avoid the 2018 Transfers under 11 U.S.C. § 548(a)(1)(B) as constructively fraudulent. The Debtors Jason Wylie and Leah Wylie received nothing for making the 2018 Transfers, but that was "a reasonably equivalent value" in exchange for the 2018 Transfers.

"Because bare legal title has no 'tangible, economic value,' a debtor's transfer of bare legal title does not constitute a fraudulent transfer and cannot be avoided under § 548." *United States Trustee v. Beard* (*In re Beard*), 595 B.R. 274, 288 (Bankr. E.D. Ark. 2018) (citation omitted); *see also Rodriguez v. Nelabovige* (*In re Kirst*), 559 B.R. 757, 763, 765-66 (Bankr. D. Col. 2016) (same).

In this case, the Trustee never alleged, and made no effort to prove, that a bare legal title in either of the Arkansas properties had any value, as of the time of the 2018 Transfers or at any other time.

In fact, the Trustee made no real effort to prove what the value would have been of an undivided one half *equitable* interest in the Arkansas properties, if Jason Wylie had had such an interest.[102] Moreover, even if Jason Wylie had owned an equitable one-half interest in the

---

[102]   In stating his contentions in the final pretrial order, the Trustee alleged that:

The ½ interest in 250.88 acres of property transferred to Kathleen Sullivan was worth an amount not less than $439,040.00 at the time of

Arkansas properties, as the Trustee contends, that interest in each property would have been subject to termination with respect to Kathleen's property if Jason predeceased Kathleen, and with respect to Christopher's property if Jason predeceased Christopher. Those possibilities, as well as the opposite possibilities of Kathleen and/or Christopher predeceasing Jason, would have to be taken into account in determining the value of the alleged equitable one-half interest. But the Trustee presented no evidence of such a valuation.[103]

### 2. The Trustee's claim that the Wylies made the 2018 Transfers with "actual intent to hinder, delay, or defraud" creditors also fails.

The zero value of the bare legal title that Jason and Leah Wylie transferred to Kathleen and Christopher Sullivan in the 2018 Transfers also dooms the Trustee's effort to avoid the transfers as actually fraudulent under 11 U.S.C. § 548(a)(1)(A). As discussed below, the Trustee did not met his burden of proving that the Wylies made the 2018 Transfers with "actual intent to hinder, delay, or defraud" any creditors, as required under 11 U.S.C. § 548(a)(1)(A). But even if the Trustee had met that burden, the Court would not avoid the 2018 Transfers, because it would

---

the transfer. . . . The ½ interest in 117.5 acres of property transferred to Christopher Sullivan was worth an amount not less than $411,250.00 at the time of the transfer.

(Final Pretrial Order (Docket # 138 in Adv. No. 21-4087) at pdf p. 5; Final Pretrial Order (Docket # 137 in Adv. No. 21-4088) at pdf p. 5).

At trial, however, the Trustee presented no evidence whatsoever to support these allegations.

[103] The only evidence about valuation that the Trustee presented was interrogatory answers, in which the Defendants stated: (1) how much they paid for the Arkansas properties when they bought them in 1990, 1993, and 2002; (2) that the Arkansas properties have no liens on them; and (3) that Defendant Christopher Sullivan believes that the value of his Arkansas property is "less than $150,000." (PX-12, Kathleen Sullivan Interrog. Answer Nos. 5, 9, 12, 13; PX-13, Christopher Sullivan Interrog. Answer Nos. 5, 9, 12, 13). This evidence does not come close to proving anything relevant about value.

61

be pointless to do so.  Avoiding the 2018 Transfers would give the Wylie bankruptcy estate nothing of value.  *Cf.* 11 U.S.C. § 541(d).[104]  And even if the 2018 Transfers (of bare legal title to the Arkansas properties) were avoided, it would make no sense to grant the Trustee any recovery under 11 U.S.C. § 550(a)(1).  Under that section, that recovery could only consist of the Trustee recovering, "for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property[.]"

Even if the Court found that the Wylies did have "actual intent to hinder, delay, or defraud" creditors, under 11 U.S.C. § 548(a)(1)(A), and even if the Court avoided the 2018 Transfers, the Court would exercise its discretion under § 550(a)(1) to order that the Trustee recover only "the value of the property" — *i.e.*, $0.00.  Therefore, it is not necessary for the Court to decide whether the Wylies made the 2018 Transfers with "actual intent to hinder, delay, or defraud" creditors.

But the Trustee did not prove that intent element under § 548(a)(1)(A) in any event.  The Court finds from the testimony of Jason Wylie and Leah Wylie that when they made the 2018 Transfers to Kathleen Sullivan and Christopher Sullivan, the Wylies did not believe that they were transferring property of any value.  The Court credits the testimony of Jason Wylie and Leah Wylie that is described and quoted in Part VII.A.4.b of this Opinion, which shows that neither Jason nor Leah thought that Jason had received any ownership of the Arkansas properties from Kathleen's 2014 deed or Christopher's 2017 deed.  Because of this, the Wylies did not

---

[104]  "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."  11 U.S.C. § 541(d).

believe that they transferred anything of value when they made the 2018 Transfers. Therefore, the Court finds that the Wylies did not make, and could not have made, the 2018 Transfers with the actual intent to hinder, delay, or defraud any of their creditors.

In addition, the Court credits the testimony of Jason and Leah, described below, showing that they made the 2018 Transfers to Kathleen and Christopher only because Kathleen and Christopher asked them to do so, and not because of any intent by Jason or Leah having anything to do with their creditors. And the testimony of Jason and Leah, as well as the testimony of Kathleen and Christopher Sullivan, all shows that Kathleen and Christopher asked for the 2018 Transfers for reasons unrelated to creditors of Jason and Leah.

The events leading up to the 2018 Transfers began on August 17, 2018. As noted above, Jason had undergone two brain surgeries for cancer, in January 2014 and in May 2017. On August 17, 2018, Jason had recently completed a long course of chemotherapy and radiation therapy, and was feeling "really sick." As Leah Wylie testified,

> On August 17th [Jason] woke up and decided he didn't want to live anymore, so I took him to the hospital, so he was sick, really sick, so he had just got done with chemo and radiation. He didn't feel well also, so there's no exact date he decided when he stopped working. The longer he went on, he just realized that he couldn't work anymore.
> . . . .
>
> . . . I took him to St. Joe Hospital immediately that day after I dropped our kids off.
> . . . .
>
> . . . Everyone just kind of thought that he would be fine, but after a year of chemo and a bunch of radiation, he ended up not being, so -
>
> Q So the year you're talking about is from the second brain

63

surgery in May of 2017 --

A  Correct.

Q  -- to August 17, 2018?

A Correct.

. . . .

He was trying to stay alive. That was the whole point of being in
the hospital, so he was in really rough shape.  He stayed the max
amount of time that St. Joe allows.  He was in bad shape.  That was
the focus was his health and him being alive.

Q What's the maximum time that St. Joe's allows?

A Two weeks.

Q So that would have basically been from August 17th, 2018,
through the end of the month?

A Probably, yeah, whatever the two-week mark is.[105]

By the time he was hospitalized on August 17, 2018, Jason's health problems had

impaired his ability to work, and that was causing financial problems.  Jason had stopped making

payments on debts he owed to his parents in July 2018,[106] and soon after August 17, 2018, the

Wylies had to stop making payments to any of their creditors.

Just before Jason's hospitalization, Kathleen Sullivan had agreed to come to Michigan to

help babysit the Wylies' children for a couple of weeks, before their school started.  Kathleen

arrived within a day or two after August 17, 2018, and when Kathleen arrived Leah Wylie told

---

[105]  Testimony of Leah Wylie (Tr. at 113-15).

[106]  *See* Testimony of Kathleen Sullivan (Tr. at 147-48); PX-6; Stipulated Facts Order at ¶¶ 4,5.

Kathleen about Jason's hospitalization.[107]  During Kathleen's time in Michigan in August 2018,

she saw Jason in the hospital two or three times.[108]  Kathleen had seen Jason in December 2017,

and thought at that time that Jason seemed "crazy,"[109] but when Kathleen saw Jason in the

hospital in August 2018, she thought that Jason was suicidal, and that he was like a "zombie."

That is when Kathleen decided that she wanted to get Jason off of the deed to her Arkansas

property.  Kathleen testified:

> . . . I saw [Jason] two or three times in that hospital. . . . So then he
> reminded me of the progress of the future suicide like my husband,
> his dad, and I had flashbacks of he wanted to kill himself.  I don't
> know how many times [Jason's father] Robert tried to kill himself,
> and he finally did kill himself.  And when I seen Jason in that
> hospital with no life in him and no energy in him and a walking
> zombie, I called Chris [Sullivan], and I said he's not going to be
> able to deal with my stuff.  He can't be a durable power of
> attorney.  He can't deal with my inheritance.  I got to take care of
> myself.  I got to do it on my own.  I don't see him inheriting this
> and handling my stuff right.  There was just -- I said, no, I changed
> my mind.  I got to have that land back at full rights of survivorship.
> He's going to die before I do.
> . . . .
>
> He went from being crazy to like dead when I visited him in that
> mental institution right after I got off the plane.  I think we went
> that next Monday to see him and a couple more times, and I
> realized from crazy to like a zombie dead.  That's when I decided
> to put -- get him off my deed. There was manic depression like his
> first dad committed suicide.
> . . . .

---

[107]  Testimony of Leah Wylie (Tr. at 130); Testimony of Kathleen Sullivan (Tr. at 140-41).

[108]  Testimony of Kathleen Sullivan (Tr. at 161, 181).

[109]  *See id.* (Tr. at 180) ("Q What happened in December of 2017?  A He looked at you like the
devil was in his eyes.  I was scared of my own son.").

Then I see him like practically a walking zombie dead trying to take his life or say things.[110]

Kathleen asked Christopher Sullivan to have attorney Donald Goodner prepare a deed to take Jason off the title of Kathleen's Arkansas property.[111] Christopher did so, and Christopher also had attorney Goodner draft a similar deed for himself. Both deeds were dated August 23, 2018, which is when attorney Goodner drafted them, but they were not signed by Jason and Leah Wylie until October 1, 2018, and then were recorded on October 12, 2018.[112]

From Kathleen's testimony quoted above, and other testimony she gave, the Court finds that Kathleen asked Jason and Leah to make the 2018 transfer for the following reasons, and not because of any concern about Jason's and Leah's creditors:

- Because Kathleen thought that if she died before Jason did, Jason would not be able to handle inheriting Kathleen's Arkansas property;[113]

- Because Kathleen feared that if Jason died before she did, Kathleen's becoming the sole owner under the 2014 survivorship deed might be complicated by trusts or other estate plans that Kathleen thought Jason and Leah may have had;[114]

---

[110] *Id.* (Tr. at 161, 181-82).

[111] *See id.* (Tr. at 160-62).

[112] *See* PX-14, PX-15; Testimony of Jason Wylie (Tr. at 39, 46-47).

[113] *See* Testimony of Kathleen Sullivan (Tr. at 161, quoted above).

[114] *See id.* (Tr. at 161-62):

> Q . . . but as someone as sophisticated as you in real estate obviously knows that if he died before you, the property would go to you because you have joints rights with full rights of -- joint tenants with full rights of survivorship; correct?

and

- Because while Kathleen and Jason were both still alive, Kathleen feared that the continuation of Jason's name on the title of Kathleen's Arkansas property, due to the 2014 survivorship deed, might restrict Kathleen's ability, in the absence of cooperation by Jason, to obtain money she might need by selling or mortgaging the property.[115]

The Court also finds, from the testimony of Christopher Sullivan, that Christopher asked for the 2018 transfer back of his Arkansas property for reasons having nothing to do with the creditors of Jason and Leah Wylie. Rather, Christopher wanted the 2018 transfer because, from what he had heard in August 2018 about Jason having mental problems, Christopher thought that if Christopher died, Jason would not be able to help Christopher's wife Daisy with her inheritance of Christopher's Arkansas property. Christopher testified:

> Q . . . What caused you at that point in time to contact the Arkansas attorney and have this deed drafted? What happened?

---

> A It would be more simple if I just got it back than to be tied up in -- I don't know -- their trust or whatever else they had going on because they got trusts or something, and I just wanted to keep it simple.

[115] *See id.* (Tr. at 182-83):

> Q . . . And because the property was deeded joint tenants, full rights of survivorship, if he did end up dying, the property would have gone to you by operation of law.

> A I may have needed income. I may have needed money. I may have needed something happening in the meantime, so I wanted total control of what I could do for my future. I wanted out of all this, changed my mind about this early inheritance thing. . . . I have the right to change my mind. It's still my land. I just changed my mind after.

67

A  I had learned that he was -- his mental competency was just declining at that point after that second surgery, and he was -- you know, he was just being overwhelmed with everything in his life, and --

. . . .

A  He couldn't handle it because he wasn't mentally -- his brain wasn't wiring right.

Q  What couldn't he handle?

A  Simple things.

. . . .

. . . if something happened to me, he could not have handled coming down there, showing my wife what to do, how to go about disbursing assets and that sort of thing.

. . . .

He just was going downhill.  I wasn't there to watch him go downhill.  I didn't know what his conditions were.  I mean I knew he had that second surgery and that he was not able to work, but he was still functionable, but then, you know, over a period of time from phone calls, you know, talking to Leah or the neighbors or whoever, that he was having, you know, the second surgery.  Obviously he was going south.  It wasn't -- it seemed good right at the time, but it was starting to affect him after that.

. . . .

Q  So someone would have to tell you what's going on; right?

A  Correct.

Q  Who told you?

A  That's what I said, Leah or the neighbor.

Q  What did they tell you?

A  That he was not doing rational things anymore.  He wasn't capable of doing business transactions or doing -- you know, he

68

just wasn't himself.[116]

The Court finds the foregoing testimony by Kathleen and Christopher Sullivan to be credible, and the Court believes it.

The testimony of Jason and Leah Wylie was consistent with that of Kathleen and Christopher Sullivan, and further shows that the 2018 Transfers were not motivated by any concern about Jason's or Leah's creditors.

Leah Wylie testified:

> Q  Did Kathy Sullivan say anything to you about wanting you to sign this deed?
>
> A  No.  Well, I had talked to them about signing it obviously.  I had to sign it, so I --
>
> Q  When did you talk to them?
>
> A  I have no idea. I don't remember the exact date.
>
> Q  Can you tell me about the conversation?
>
> A  Well, their son was sick so for obvious reasons.  We talked about [Jason] not making good decisions and him not being okay to make any decisions if something happened to them, so --
>
> Q  Did you talk about him being unable to pay his debts?
>
> A  No.
>
> Q  Did you talk about him being unable to work?
>
> A  No.
>
> Q  About him being unable to farm?

---

[116]  Testimony of Christopher Sullivan (Tr. at 89-91).

A  No.

Q  Talk about him shutting down his businesses?

A  No.

Q  Who reached out to you and said, "We want the property transferred back"?  Who was it?

A  I don't recall which one.

Q  You don't know if it was Kathy or Christopher?

A  [No].

Q  And you don't remember the context of any conversations?

A  No.  The context was that their son was sick and not making good decisions and --
. . . .

A  I remember discussing it with both of them.  I don't remember which one I talked to first, so I thought it was a good idea because he was at this time and still to this day not able to help.
. . . .

Q  And why did you sign those deeds?

A  I thought it was a good idea.

Q  Why did you think it was a good idea?

A  I didn't think [Jason] was capable if something were to happen to Chris for him to go down and take care of everything.

Q  Did you do that -- did you sign those deeds so that your creditors wouldn't receive any property from it --

A  No.

Q  -- anything from it or to prevent them from taking it?

A  No.[117]

Jason testified that his parents asked for the 2018 Transfers, and told him that they

wanted the transfers because they did not think Jason could handle the property any more after

their deaths, because he had been in a "mental institution."  First with respect to his 2018 deed to

Christopher,[118] and then with respect to both of the 2018 deeds, Jason testified this way:

> Q . . . [W]e know that the attorney from Arkansas, Donald
> Goodner, drafted the document; correct?
>
> A  Yep.
>
> Q  Did you ask him to draft the document?
>
> A  No.
>
> Q  Who asked him to draft the document?
>
> A  My parents did.
>
> Q  Why did they want the property transferred back to them?
>
> [A]  Because they didn't think I could handle it no more. . . . They
> didn't think I could handle it no more.
> . . . .
>
> Q  When you say they didn't think you could handle it no more,
> what do you mean by that?
>
> A  Because I was in a mental institution for a month or a week.
> They didn't -- that's what they told me, so --
>
> Q  What did they tell you?
>
> A  They didn't think I could handle it no more.

---

[117]  Testimony of Leah Wylie (Tr. at 120-21, 131–32)

[118]   PX-15.

Q  What exactly were you handling that you wouldn't be able to handle?

A  Upon their death.

. . . .

Q  Who gave you -- who gave you this deed to sign, this deed that transfers property back to Christopher Sullivan?

A  They did.

Q  Who's "they"?

A  My parents sent it to me.

Q  They mailed it to you?

A  Yeah.

Q  Were there any instructions?

A  Just sign.[119]

The Court finds the forgoing testimony by Jason and Leah to be credible, and the Court believes it.

Of course, Jason Wylie's health problems and his August 2018 hospitalization coincided with the financial problems caused by Jason's inability to work any more.  The Trustee points to those financial problems, as well as the existence of some of the so-called "badges of fraud," among other things,[120] to try to persuade the Court that the 2018 Transfers were done by Jason and Leah with actual intent to hinder, delay, or defraud their creditors.  But considering all the

_____

[119]  Testimony of Jason Wylie (Tr. at 40-42).

[120]  For a recent discussion by this Court of the "badges of fraud" that can be used to try to help prove actual fraudulent intent, *see Miller v. Sullivan* (*In re Wylie*), 665 B.R. 144, 181 (Bankr. E.D. Mich. 2024).

72

evidence presented, the Court concludes that the evidence strongly negates any finding of actual fraudulent intent, and that the Trustee has failed to meet his burden of proving such actual intent by a preponderance of the evidence. Rather, the Court finds that neither Jason nor Leah had any such actual intent.

For the reasons stated in this Opinion, the Court must find for the Defendants on all counts of the Trustee's First Amended Complaints in these two adversary proceedings.

## VIII.  Conclusion

For the reasons stated in this Opinion, the Court will enter a judgment in each of these adversary proceedings, in favor of the Defendants, and dismissing all counts of the Trustee's First Amended Complaints, with prejudice.

**Signed on April 10, 2025**



/s/ Thomas J. Tucker
_____
**Thomas J. Tucker**
**United States Bankruptcy Judge**

73